UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| DONALD EAST, | 4:19-CV-04126-RAL |
| Plaintiff, | |
| vs. | OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| WARDEN ROBERT DOOLEY, WARDEN BRENT FLUKE, PA BRAD ADAMS, PA KARISSA ZIMMER, RN DAYNA KLAWITTER, LPN BRITTANY HUBER, CPL. AHRENS, CPL. BARTA, CO MASTALIR, JANE DOES 1 AND 2 AND 3, OTHER UNKNOWN PERSONS AND ENTITIES, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES, | |
| Defendants. | |

Plaintiff Donald East is an inmate at Mike Durfee State Prison (MDSP) in Springfield, South Dakota. He filed a pro se complaint under 42 U.S.C. § 1983 alleging that various individuals at MDSP violated his Eighth Amendment rights by being deliberately indifferent to his serious medical needs and subjecting him to excessive force and unconstitutional conditions of confinement. Doc. 1.   Defendant Brad Adams filed a motion to dismiss East's complaint, Doc. 19, which this Court granted, Doc. 100. The remaining Defendants moved for summary judgment on qualified immunity grounds. Doc. 40.  This Court grants the Defendants' motion because East has not presented sufficient evidence that the remaining Defendants violated his Eighth Amendment rights.

1

I.    **Preliminary Issues**

East has litigated prior claims under § 1983 concerning his allegedly constitutionally deficient care while an inmate at Minnehaha County Jail and then MDSP. East v. Minnehaha County, 16-CV-4122-RAL. In that prior case, this Court appointed counsel for East and ultimately granted summary judgment for various defendants. Apparently encouraged by this Court's decision to appoint counsel in his prior case, East has filed eleven motions to appoint counsel in this case. Docs. 3, 9, 11, 23, 62, 64, 76, 92, 93, 94, 95. This Court has already denied seven of those motions, Docs. 7, 12, 39, 70, 77, and now denies the remaining four for reasons previously explained. East also filed two ex parte motions to impose "severe" sanctions on Defendants for attempting to mislead the Court, Docs. 92, 94, and a motion asking this Court to inform the Department of Corrections that East has paid the $505 fee for the interlocutory appeal he filed, Doc. 97. East has not identified an appropriate basis for sanctioning Defendants, so his motions for sanctions are denied. Because the Clerk of Court has now informed the Department of Corrections that East does not owe any money in this case, Doc. 99, his motion concerning the $505 filing fee is denied as moot.

East filed an objection to the affidavit of Dr. Mary Carpenter which Defendants had submitted in support of their motion for summary judgment. Doc. 61. Dr. Carpenter is a licensed physician who serves as the Medical Director for Correctional Health Care. Doc. 48 at ¶ 2. Much of Dr. Carpenter's affidavit simply recounts East's medical records during the relevant time periods; she explains that she reviewed these medical records herself and quotes extensively from them. Doc. 48. In a few paragraphs, however, Dr. Carpenter opines that the Defendants were not deliberately indifferent to East's serious medical needs or that East's allegations are not credible.

2

See, e.g., Doc. 48 at ¶¶ 4, 11, 21, 124.  In a few other paragraphs, she offers her medical opinion about what East's medical records show.  See, e.g., Doc. 48 at ¶¶ 13, 15, 16, 111.

East argues that this Court should disregard all the statements in Dr. Carpenter's affidavit because they were not based on personal knowledge; that Dr. Carpenter's statements on whether the Defendants were deliberately indifferent are improper; and that Dr. Carpenter's medical opinions are inadmissible because the medical records Dr. Carpenter used "contain insufficient data," her medical opinions contradict the "specialist's medical records," and Dr. Carpenter lacked the necessary personal knowledge.  Doc. 61.

This Court will not disregard all the statements in Dr. Carpenter's affidavit based on a lack of personal knowledge.  East is correct that Rule 56(c)(4) of the Federal Rules of Civil Procedure requires that Dr. Carpenter's affidavit "be made on personal knowledge," Fed. R. Civ. P. 56(c)(4), but her review of his medical records satisfies this requirement, Maday v. Dooley, 4:17-CV-04168-KES, 2019 WL 4935705, at *48–51 (D.S.D. Mar. 8, 2019) (finding that an affidavit from Dr. Carpenter similar to the one filed in this case satisfied Rule 56(c)(4)); Thompson v. Bank of N.Y. Mellon Tr. Co., No. 4:13-cv-00120-KGB, 2016 WL 3511599, at *9 (E.D. Ark. Mar. 31, 2016) ("For the purposes of summary judgment, an affiant may acquire personal knowledge by a review of records that she did not create herself." (citation omitted)); Stenger v. World Harvest Church, Inc., No. Civ.A 1:04CV00151-RW, 2006 WL 870310, at *12 (N.D. Ga. Mar. 31, 2006) (collecting cases).

However, this Court will disregard Dr. Carpenter's opinion that the Defendants were not deliberately indifferent.  See Doc. 48 at ¶¶ 4, 124.  Witnesses, even expert ones, generally may not give their opinion on ultimate questions of law.  S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc., 320 F.3d 838, 841 (8th Cir. 2003) ("[E]xpert testimony on legal matters is not

admissible."); Kostelecky v. NL Acme Tool/NL Indus., 837 F.2d 828, 830 (8th Cir. 1988) (explaining that opinion testimony that "merely tells the jury what result to reach" is an inadmissible legal conclusion). And opinions on whether a defendant was deliberately indifferent are the sort of legal conclusions courts have refused to admit. Omar v. Babcock, 177 F. App'x 59, 63 n.5 (11th Cir. 2006) (per curiam) (holding that district court did not error by striking portions of an expert's affidavit that contained "legal conclusions as to whether appellants acted with deliberate indifference."); Berry v. City of Detroit, 25 F.3d 1342, 1353–54 (6th Cir. 1994) (explaining that an expert could not testify that a police department's lax discipline policies indicated that the city was deliberately indifferent); Jenkins v. Corizon Health Inc., NO. CV418-099, 2020 WL 4589689, at *4 (S.D. Ga. Aug. 7, 2020) (refusing to allow a doctor to testify that defendants were not deliberately indifferent because this was a legal conclusion). East's arguments about Dr. Carpenter's medical opinions are moot because this Court has not relied on portions of her opinions with which East disagrees in granting the Defendants' motion for summary judgment.

The other preliminary matter is the twenty-two-page "Objection" East filed in response to the Defendants' reply brief. Doc. 84. In his "Objection," East responds to many of the arguments in the Defendants' reply brief, asks this Court to defer ruling on Defendants' summary judgment motion until he has been able to depose Dr. Carpenter, and asks this Court to allow him to file "supplemental briefing" because of new arguments and evidence offered by the Defendants. Defendants filed a motion to disregard East's objection, Doc. 85, and East filed a sixteen-page response to that motion, Doc. 87. East's "Objection" was not filed as a motion, but the requests he makes therein are denied. There is no need to depose Dr. Carpenter, and the hundreds of pages of briefing already filed in this case are more than enough. The Defendants' motion to disregard East's objection is denied as moot.

## II.   Facts[1]

East's complaint regarding deliberate indifference to his serious medical needs and otherwise unconstitutional conditions of confinement concerns three different time periods: August 4, 2017 to August 9, 2017; May 26, 2018 to July 30, 2018; and January 17, 2019 to "present." Doc. 1 at ¶ 18.

### A. August 4, 2017 to August 9, 2017

East had surgery on his foot on August 2, 2017, and was prescribed hydrocodone for pain. Doc. 51 at ¶ 11; Doc. 60 at ¶ 11; Doc. 41-2 at 2–3; Doc. 59 at ¶ 27. He submitted a kite-request slip on Friday, August 4, 2017, reporting throat pain after his surgery, "extreme pain urinating," and that his "lower abdomen hurt bad no bowel since Tues. night." Doc. 51 at ¶ 11; Doc. 60 at ¶ 11; Doc. 41-1; Doc. 59 at ¶ 5. MDSP Health Services responded by seeing East on the morning of August 4. Doc. 51 at ¶ 12; Doc. 60 at ¶ 12. Records from this visit show that East reported "[p]ain with urination" since his surgery and frequent urination with a strong stream, but denied burning, bleeding, or discharge. Doc. 51 at ¶ 12; Doc. 60 at ¶ 12; Doc. 41-2 at 1. He also reported cramping in the lower abdomen. Doc. 41-2 at 1. East's temperature was normal, and he did not complain of having a fever or chills. Doc. 51 at ¶ 20; Doc. 60 at ¶ 20  The medical record notes that East was not in "acute distress" during this appointment, but East disagrees with this assessment. Doc. 51 at ¶ 12; Doc. 60 at ¶ 12; Doc. 41-2 at 3. He claims that his various complaints show that he was in acute distress and that he has no control over what the nurses write in his records. Doc. 60 at ¶ 12.

---

[1]This Court takes the facts primarily from those portions of the Defendants' statement of material fact not being disputed by East, as well as from East's complaint and affidavit.

Nurse Rachel Tycz took a urine sample from East, which showed a "large amount of glucose" (East claims ten times the normal range) but was otherwise normal.[2] Doc. 51 at ¶¶ 13, 16; Doc. 60 at ¶¶ 13, 16; Doc. 59 at ¶ 8; Doc. 59-1 at 113.   His urine was negative for elevated white blood cells[3] and was "clear/amber" rather than dark or bloody. Doc. 51 at ¶¶ 13, 17, 21; Doc. 60 at ¶¶ 13, 17, 21; Doc. 41-3.   PA Adams reviewed the urine sample because of the high levels of glucose. Doc. 51 at ¶ 13; Doc. 60 at ¶ 13. He ordered that East undergo A1C[4] test on Monday, August 7, to determine whether East had chronically elevated blood sugars from undiagnosed diabetes. Doc. 51 at ¶ 14; Doc. 60 at ¶ 14. East claims that Nurse Tycz called him back to Health Services on the morning of August 4 and told him that he did not have a urinary tract infection (UTI),[5] but that, because his "sugar was 'extremely' high, it was a kidney and/or diabetes issue." Doc. 59 at ¶ 9.

---

[2]East's urine sample also showed a "trace" amount of protein.  Doc. 60 at ¶ 13; Doc. 59 at ¶ 8. East claims that the urine test showed "protein in the urine" and that, according to the Merck Manual of Medical Information Second Home Edition, protein in the urine "is usually a sign of kidney disorders." Doc. 60 at ¶ 16; Doc. 59-1 at 77. However, the medical records show that East had only a "trace" amount of protein in his urine, Doc. 59-1 at 113, and trace amounts of protein in the urine is considered normal, University of Rochester Medical Center Health Encyclopedia, https://www.urmc.rochester.edu/encyclopedia/content.aspx?contenttypeid=167&contentid=urine _protein_dipstick (last visited Sept. 30, 2020) (stating that "[y]our urine normally has a small amount of protein"); Urinalysis, Mayo Clinic, https://www.mayoclinic.org/tests- procedures/urinalysis/about/pac-20384907 (last visited Sept. 30, 2020) ("Low levels of protein in urine are normal"); Protein in Urine, RWJ Barnabas Health, https://www.rwjbh.org/treatment- care/kidney-care/conditions-treatments/protein-in-urine/ (last visited Sept. 30, 2020) ("Trace amounts of protein in urine is normal, but it should mostly be protein-free.").
[3]Elevated white blood cells in a urine test indicates an infection. Doc. 51 at ¶ 21; Doc. 60 at ¶ 21.
[4]The A1C test is generally used to diagnose diabetes. Doc. 51 at ¶ 14; Doc. 60 at ¶ 14.
[5]The Defendants include several statements of fact explaining that East did not show any symptoms of having a UTI. Doc. 51 at ¶¶ 17–22. East quibbles with these statements a bit but agrees that he was not suffering many of the symptoms of a UTI. Doc. 60 at ¶¶ 17–22.  In fact, East says that he is not claiming that he had a UTI, but rather that he suffered from tubulointerstitial nephritis. Doc. 60 at ¶¶ 17, 22.

According to East, he went to Health Services around 11:45 p.m. on August 5, 2017, to receive his dose of hydrocodone. Doc. 59 at ¶ 14; Doc. 60 at ¶ 23. He told Nurse Jane Doe 1 that his "extreme pain while urinating had increased," and she said to "tell us if it gets worse." Doc. 59 at ¶ 14; Doc. 60 at ¶ 23. East returned to Health Services early in the morning on August 6, 2017, to receive another dose of hydrocodone. Doc. 60 at ¶ 23; Doc. 59 at ¶ 16. He claims that he told Nurse Jane Doe 2 about his "continued extreme pain" while urinating, but that she responded that there "really isn't anything we can do," although she would review his urine sample. Doc. 59 at ¶ 16; Doc. 60 at ¶ 23. East's medical records do not mention his complaints of pain on August 5 and 6, which East attributes to faulty record keeping by Nurses Jane Doe 1 and 2. Doc. 51 at ¶ 24; Doc. 60 at ¶¶ 24–25; Doc. 59 at ¶ 18.

On August 7, 2017, East's A1C test showed that his glucose levels were normal, indicating that he did not have diabetes.[6] Doc. 51 at ¶ 15; Doc. 60 at ¶ 15; Doc. 1 at ¶¶ 28, 31. PA Adams ordered no further treatment for East's complaint of urinary tract pain after the blood test results came back. Doc. 59 at ¶ 31; Doc. 1 ¶ 29. East says he continued to suffer extreme pain with urination from August 7 through August 9, although he does not claim that he reported his pain to MDSP officials during this time. Doc. 1 at ¶¶ 30, 35; Doc. 59 at ¶ 21.

East saw his podiatrist, Dr. Terence Pedersen, on August 9, 2017, for a post-operation checkup on his foot. Doc. 51 at ¶ 32; Doc. 60 at ¶ 32; Doc. 52-1 at 13–15. He alleges that he reported "extreme" pain when urinating and frequent urination. Doc. 59 at ¶ 33. Dr. Pedersen's

---

[6]Paragraph 16 of the Defendants' statement of undisputed material facts states that since "East was not diabetic, it was thought that the glucose level in his urine sample might have been the result of either the stress from his recent foot surgery or he may have simply recently eaten something that was high in sugar." Doc. 51 at ¶ 16. This language is a direct quote from Dr. Carpenter's affidavit. Doc. 48 at ¶ 12. However, Dr. Carpenter does not explain who thought the high levels of glucose were from stress or surgery or where she got such information. Doc. 48 at ¶ 12.

records from the appointment note that East complained of "some pelvic pain" and reported having a negative UTI test. Doc. 52-1 at 14. Dr. Pedersen wrote that East was "not sure what his next step is for treatment options, and that is going to have to be up to the physicians at the prison." Doc. 52-1 at 14. According to East, Dr. Pedersen used his phone to determine that Keflex was an appropriate medication for a UTI. Doc. 1 at ¶ 38; Doc. 59 at ¶ 35. Dr. Pederson prescribed Keflex for East's foot as a precautionary measure, but wrote that "[t]his may also help with some of [East's] pelvic pain." Doc. 52-1 at 14–15; Doc. 51 at ¶¶ 35–36; Doc. 60 at ¶¶ 35–36.

East's pain with urination resolved by the morning of August 10, 2017. Doc. 1 at ¶ 40; Doc. 60 at ¶ 37; Doc. 59 at ¶ 37; Doc. 51 at ¶ 37. He wrote in his log that he had used the bathroom that morning with no pain, that the Keflex "really worked," and that he would have continued to suffer had Dr. Pedersen not prescribed it. Doc. 1 at ¶ 40; Doc. 60 at ¶ 37. East alleges that he "likely would have developed kidney failure" had Dr. Pedersen not intervened and that PA Adams's lack of treatment caused him "inflammation in the tubules and extreme pain." Doc. 1 at ¶ 42. According to Dr. Carpenter, her review of East's medical records showed "no medical evidence whatsoever" to support East's allegations that he would have developed kidney failure. Doc. 48 at ¶ 29; Doc. 51 at ¶ 40.

East did not file an inmate grievance in August or September 2017 concerning the medical care he received for his extreme urinary-tract pain and alleged tubulointerstitial nephritis. Doc. 51 at ¶ 38; Doc. 60 at ¶ 38. East claims that he tried to file a grievance on these issues, but that Unit Coordinator Brian Foley refused to give him a grievance form. Doc. 60 at ¶ 38; Doc. 59 at ¶ 280.

**B. May 26, 2018 to July 30, 2018**

East submitted a kite-request slip on May 26, 2018, requesting to be seen by medical for his right great toe. Doc. 51 at ¶ 42; Doc. 60 at ¶ 42; Doc. 52-1 at 19. He wrote that his toe was

fine that morning but that when he removed his socks around 7:00 p.m. it looked like it was "being eaten away." Doc. 51 at ¶ 42; Doc. 60 at ¶ 42; Doc. 52-1 at 19.  Nurse Dayna Klawitter saw East later that evening at Health Services.[7] Doc. 51 at ¶ 43; Doc. 60 at ¶ 43; Doc. 52-1 at 20–22.  East reported walking at recreation that day with "no problem," but then later experienced stinging pain and noticed what he believed was an infection in his right great toe. Doc. 51 at ¶ 43; Doc. 60 at ¶ 43; Doc. 52-1 at 50.  East expressed concern that his right toe was leaning inward, saying that he had undergone surgery on the toe and had not noticed this curvature until that time. Doc. 52-1 at 21; Doc. 51 at ¶ 45; Doc. 60 at ¶ 45.   Nurse Klawitter examined East's right foot and noted a "2-3 mm" circle of white tissue at the "upper medial tip aspect of the right great toenail." Doc. 52-1 at 21.  She wrote that the toe was "pink and slightly swollen" without any drainage or streaking. Doc. 52-1 at 21.  The base of East's left great toe was red, and he had "dried red" on the toenail. Doc. 52-1 at 21.  East rated his pain as a five out of ten, although Nurse Klawitter noted that he was not in any distress and did not grimace or moan when walking or during her examination. Doc. 52-1 at 21.  In the "Assessment" section of the record from this appointment, Nurse Klawitter wrote "Alteration in Skin Integrity," "Potential for Infection," and "Actual Infection." Doc. 52-1 at 21.  She told East to soak his feet four times a day with warm soapy water, let them air dry, and

---

[7]Some of Defendants' statements of material fact cite to a "Klawitter" affidavit for support. See, e.g., Doc. 51 at ¶¶ 47–50. East claims that he never received an affidavit by Nurse Klawitter and that he therefore needs discovery to properly oppose Defendants' motion for summary judgment. Doc. 60 at ¶¶ 47–50. This Court also has not found an affidavit from Nurse Klawitter in the record. However, the paragraphs that cite to the Klawitter affidavit are quoting the medical records Nurse Klawitter created from her appointments with East. Doc. 51 at ¶¶ 47–50. No discovery is needed because East has these medical records and they are part of the record in this case.

to apply a small amount of bacitracin.[8]  Doc. 51 at ¶ 46; Doc. 60 at ¶ 46; Doc. 52-1 at 22.  She also wrote that she told East that Health Services would recheck him the next day.  Doc. 52-1 at 22.

East takes issue with some parts of the medical record from his May 26, 2018 appointment with Nurse Klawitter.  Doc. 60 at ¶¶ 43– 47; see also Doc. 59 at ¶¶ 49–52.  He asserts that he was in distress during the appointment, that Nurse Klawitter couldn't have known whether he grimaced because she wasn't looking at his face the whole time, that his whole toe was red so no streaking could be seen, and that his toe showed a "considerable amount of drainage" Doc. 60 at ¶¶ 43, 44, 46.  According to East, Nurse Klawitter agreed that his right foot was "always having troubles"[9] and told him that she believed he had a staph infection.  Doc. 59 at ¶¶ 49, 51.  However, she did not obtain a wound culture from East, which he claims is "protocol."  Doc. 60 at ¶ 47; Doc. 59 at ¶ 53.  East alleges that he asked about seeing the provider and getting some antibiotics but that Nurse Klawitter said she would not forward his complaint to the provider because she did not want East to receive antibiotics and have his infection become "MRSA, resistant to antibiotics."  Doc. 60 at ¶ 47; Doc. 59 at ¶ 51.  East also alleges that Nurse Klawitter wanted to wait until May 29 to recheck his toe, but that he asked that this occur earlier.  Doc. 60 at ¶ 47; Doc. 59 at ¶ 49.

Nurse Klawitter rechecked East's feet on May 27, 2018.  Doc. 51 at ¶ 48; Doc. 60 at ¶ 48.  She noted that the toes "remain[ed] the same with slight improvement."  Doc. 52-1 at 24; Doc. 51 at ¶ 48; Doc. 60 at ¶ 48.  East's right toe still had a "pea size" area of white tissue at the inner tip of the nail but did not have any drainage.  Doc. 52-1 at 24; Doc. 51 at ¶ 48; Doc. 60 at ¶ 48.  Nurse

---

[8]Bacitracin is an antibiotic used to "prevent minor skin infections caused by small cuts, scrapes, or burns."  WebMD, https://www.webmd.com/drugs/2/drug-14270/bacitracin-topical/details (last visited Sept. 30, 2020).

[9]As this Court explained in its earlier opinion, East has been through an "odyssey of medical issues regarding his right foot," including a fractured heal and amputation of his small toe because of an infection.  East v. Minnehaha Cty, 4:16-CV-04122-RAL, 2019 WL 1434974, at *21 (D.S.D. Mar. 29, 2019).

Klawitter did note a pea-sized spot of red drainage on East's sock, however. Doc. 52-1 at 24; Doc. 60 at ¶ 48. She did not note any streaking, increased redness, swelling, or warmth with palpitation in East's great toes. Doc. 52-1 at 24; Doc. 51 at ¶ 49; Doc. 60 at ¶ 49. According to the record from this appointment, East said that he still had the stinging pain, which he rated at "5–6/10," and that his right toe was still curved outward, which concerned him. Doc. 52-1 at 24; Doc. 51 at ¶ 49; Doc. 60 at ¶ 49. Nurse Klawitter did not do a wound culture for East or offer him any pain medicine. Doc. 59 at ¶ 56. Nurse Klawitter told East to continue soaking, rinsing, and applying bacitracin to his toes, that they would recheck his toes on May 29, 2018, and that Health Services might order a visit with a provider if East's condition had not improved by then. Doc. 52-1 at 24; Doc. 51 at ¶ 50; Doc. 60 at ¶ 50. East said that he was "agreeable with this plan." Doc. 52-1 at 24; Doc. 51 at ¶ 50; Doc. 60 at ¶ 50.

East disagrees with parts of the medical record from his May 27 appointment with Nurse Klawitter. He claims that his toes had not improved, that no streaking could be seen on his right toe because it "remained completely red," and that he told Nurse Klawitter that his pain had increased from "5/10" to "6–7/10." Doc. 59 at ¶ 54; Doc. 60 at ¶ 49. East also alleges that Nurse Klawitter wrote that he could possibly see a provider if his condition did not improve only because he asked to see a provider who could prescribe antibiotics. Doc. 60 at ¶ 50; Doc. 59 at ¶ 54. According to East, Nurse Klawitter told him again that she did not want a provider to give him antibiotics because he needed to "build [his] immune system up." Doc. 59 at ¶ 55.

Nurse Candace Fejfar rechecked East's toes on May 29, 2018. Doc. 52-1 at 25; Doc. 51 at ¶ 51; Doc. 60 at ¶ 51. East said he was worried about the redness of both toes and the "curving" of his right great toe. Doc. 52-1 at 25; Doc. 51 at ¶ 51; Doc. 60 at ¶ 51. East's right toe was "red and slightly swollen with a pea-sized macerated/scabbed area on the medial side of great toenail."

11

Doc. 52-1 at 25; Doc. 51 at ¶ 52; Doc. 60 at ¶ 52.  There was also "tan drainage" coming from "the side of the nail bed along the line of the surrounding tissue."  Doc. 52-1 at 25; Doc. 51 at ¶ 52; Doc. 60 at ¶ 52.  East's left great toe was red and slightly swollen and also had tan drainage.  Doc. 52-1 at 25.  Nurse Fejfar obtained a culture from the drainage areas on each great toe.  Doc. 52-1 at 25; Doc. 51 at ¶ 53; Doc. 60 at ¶ 53.  She wrote that Health Services would "monitor" East's toes "for now" and that they could "re-evaluate after swelling/infection is resolved."  Doc. 52-1 at 25; Doc. 51 at ¶ 53; Doc. 60 at ¶ 53.  East claims that Nurse Fejfar's notation about reevaluating his toes was in response to his request to see a provider.  Doc. 60 at ¶ 53; Doc. 59 at ¶ 57.  Nurse Fejfar told East to continue soaking his toes at least twice daily while they waited for the results of the cultures, and that he could apply bacitracin and band aids "for protection."  Doc. 51 at ¶ 53; Doc. 60 at ¶ 53; Doc. 52-1 at 25.

Health Services saw East again on May 31, 2018.  Doc. 52-1 at 27–28; Doc. 51 at ¶ 54; Doc. 60 at ¶ 54.  Health Services told East that his culture results showed staph and strep infections in his toes, Doc. 59 at ¶ 59, and started him on the antibiotic Bactrim, Doc. 52-1 at 28; Doc. 51 at ¶ 54; Doc. 60 at ¶ 54.  East says he was "very concerned" on May 31 because the area of flesh "rotting away" had doubled since he noticed it on May 26.  Doc. 59 at ¶ 59.  He alleges that he asked to see a provider, but Health Services ordered that he have a "nursing recheck" in ten days instead.  Doc. 52-1 at 28; Doc. 51 at ¶ 54; Doc. 60 at ¶ 54; Doc. 59 at ¶ 59.  He alleges that he asked to see the provider the next day, but that this request was also denied.  Doc. 59 at ¶ 61.

On June 4, 2018, East submitted a grievance requesting to see the provider about his staph infection and the curvature of his right toe.  Doc. 59 at ¶ 62.  He explained that he had a history of infections in his feet, that one such infection had resulted in amputation of part of his foot, and that he had started taking antibiotics without seeing any improvement.  Doc. 59 at ¶ 62.  East claims

that an MDSP officer asked Health Services to see East that same day, but that Health Services declined, saying East had a recheck scheduled in a few days. Doc. 59 at ¶ 63. According to East, his right toe had worsened by June 4, appearing "black under the skin" and growing in size. Doc. 59 at ¶ 63.

Nurse Robin Myer rechecked East's toes on June 9, 2018. Doc. 52-1 at 29; Doc. 51 at ¶ 55; Doc. 60 at ¶ 55. According to Nurse Myer's notes, East reported a dull pain and "some improvement" but that he was still very concerned that "the open area is getting slightly larger." Doc. 52-1 at 29; Doc. 51 at ¶ 55; Doc. 60 at ¶ 55. Nurse Myer wrote that although East still had some redness and swelling, his "[w]ound bed" was "in healing stages" and she did not detect any drainage or foul odor. Doc. 52-1 at 29. She assessed East's condition as "improving" though he could benefit "from continued antibiotic use." Doc. 52-1 at 29. She also noted that East's "culture and sensitivity results came back with the Bact[r]im being sensitive at <=10 MIC. Alternative antibiotics with lower MIC reported." Doc. 52-1 at 29. Nurse Myer's plan was to "review this information with the on-call provider for further recommendations." Doc. 52-1 at 29.

East has a different account of his June 9 appointment with Nurse Myer. He recalls reporting that his right toe had bloody drainage and a foul odor and that he told Nurse Myer that his "broken toe hurts really bad." Doc. 59 at ¶ 66; Doc. 50 at ¶¶ 55–56. Nurse Myer told East she would contact the provider to see what he said. Doc. 59 at ¶ 66.

Nurse Myer reviewed East's sensitivities and her assessment of East with a provider. Doc. 51 at ¶ 57; Doc. 60 at ¶ 57; Doc. 52-1 at 31–32. The provider decided to continue East on Bactrim for five more days and to prescribe Doxycycline, another antibiotic. Doc. 51 at ¶ 57; Doc. 60 at ¶ 57; Doc. 52-1 at 31–32. Nurse Myer saw East for a follow-up appointment on June 10, 2018. Doc. 59 at ¶ 68; Doc. 52-1 at 31. She wrote that East's toe infection had "improved" though he

still had "some redness and slight edema." Doc. 52-1 at 31. According to East, Nurse Myer said she hadn't told the provider about East's belief that his foot was broken because "it's a separate issue." Doc. 60 at ¶ 57; Doc. 59 at ¶ 68. East alleges that he told Nurse Myer that he continued walking on his foot despite believing it was broken because Health Services would not "give [him] a wheelchair or do anything for it including the pain." Doc. 60 at ¶ 57; Doc. 59 at ¶ 68.

East submitted a kite-request slip on June 11, 2018, requesting care for his "obvious broken" right toe. Doc. 51 at ¶ 58; Doc. 60 at ¶ 58; Doc. 52-1 at 33. East wrote that he had been complaining about the toe since May 26, 2018, but that he had yet to get an x-ray or receive any pain medication. Doc. 52-1 at 33. He also wrote that he had yet to see a provider despite multiple requests to do so. Doc. 52-1 at 33.

Health Services responded to East's June 11 kite by seeing him that same day. Doc. 51 at ¶ 59; Doc. 60 at ¶ 59; Doc. 52-1 at 35–38. East reported an "aching, throbbing" pain in his right toe and rated it a "9/10." Doc. 52-1 at 35–36. Nurse Amanda DeJong noted swelling, deformity, tenderness, and a limited range of motion in East's right great toe. Doc. 52-1 at 36; Doc. 59 at ¶ 72. Her notes from the appointment confirm that East had been receiving treatment for an infection in his right great toe since May 26, 2018. Doc. 52-1 at 36; Doc. 51 at ¶ 59; Doc. 60 at ¶ 59. Nurse DeJong prescribed Ibuprofen for East's pain and swelling and instructed him to use "[r]est, ice, compression, [and] elevation." Doc. 51 at ¶ 60; Doc. 60 at ¶ 60. A provider reviewed East's chart at Nurse DeJong's request and ordered that East receive an x-ray to see whether the hardware in his right foot[10] was moving or had broken. Doc. 51 at ¶ 62; Doc. 60 at ¶ 62; Doc. 52-1 at 39–41. This x-ray was taken on June 11, 2018, the same day East submitted his kite-request slip. Doc.

---

[10]This Court's opinion and order in East's previous case details his prior right foot issues and ultimate surgery. East, 2019 WL 1434974, at *11–13.

52-1 at 45. The x-rays were "stable," showing "healed fractures" and "no displacement of the hardware." Doc. 52-1 at 45; Doc. 51 at ¶ 63; Doc. 60 at ¶ 63.

East submitted another kite-request slip on June 15, 2018, complaining that he was not receiving any treatment. Doc. 52-1 at 42; Doc. 51 at ¶ 64; Doc. 60 at ¶ 64. East wrote that he was no longer on any antibiotics,[11] that he had not seen a nurse since June 11, 2018, when x-rays were taken, that he had not seen a doctor yet, and that his infection and pain were worsening. Doc. 52-1 at 42; Doc. 51 at ¶ 64; Doc. 60 at ¶ 64. That same day, Dr. Pedersen, East's podiatrist, called Health Services to discuss letters he had received from East and East's father expressing concern that East's foot was broken. Doc. 59 at ¶ 77; Doc. 59-1 at 149. Health Services' notes from this call say that a nurse told Dr. Pedersen that every patient goes through a triage process and that "appropriate referrals stem from the appropriate subsequent encounters." Doc. 59-1 at 149. Health Services notified East that Dr. Pedersen had received his letters and told him that a nurse "would direct [him] through the appropriate referral process." Doc. 59-1 at 149. East alleges that he did not "receive any appropriate referral process." Doc. 59 at ¶ 79.

East submitted another kite-request slip on June 20, 2018, saying that his staph infection was worse and that his foot was still in pain. Doc. 52-1 at 43; Doc. 51 at ¶ 67; Doc. 60 at ¶ 67. Nurse Tycz saw East that same day when he came to sick call complaining of the infection in his right great toe. Doc. 52-1 at 44–48; Doc. 51 at ¶ 67; Doc. 60 at ¶ 67. East explained that his left toe had healed but that his right great toe had continued to worsen. Doc. 52-1 at 44; Doc. 51 at ¶ 68; Doc. 60 at ¶ 68. East said that his lawyer wanted to know why medical staff hadn't followed up on his right great toe, and Nurse Tycz explained that "rechecks are not always required or

---

[11]East finished his five-day prescription for Bactrim and Doxycycline on June 14, 2018. Doc. 52-1 at 31.

necessary, and that it is his responsibility to attend a sick call if he feels the current treatment plan is not working."[12] Doc. 52-1 at 44; Doc. 51 at ¶ 69; Doc. 60 at ¶ 69.  East told Nurse Tycz that his right great toe was becoming more painful, that the redness had increased, and that he had new swelling on the top of his right foot.  Doc. 52-1 at 44–45.  East's right great toe was pink, slightly swollen, and showed a "[v]ery scant" amount of serosanguinous drainage.  Doc. 52-1 at 45; Doc. 51 at ¶ 70; Doc. 60 at ¶ 70.  East grimaced in discomfort when Nurse Tycz palpitated the toe.  Doc. 52-1 at 45; Doc. 60 at ¶ 70.  Nurse Tycz obtained a culture from East's right great toe and told him that a doctor would assess his toe and review his x-rays with him on June 22.  Doc. 51 at ¶ 71; Doc. 60 at ¶ 71; Doc. 52-1 at 46; Doc. 59 at ¶ 80.  She also told him to continue soaking his foot and taking commissary Tylenol and agreed to his request for a wheelchair.  Doc. 59 at ¶ 80; Doc. 52-1 at 46.

Dr. Melvin Wallinga saw East on June 22, 2018.  Doc. 51 at ¶ 73; Doc. 60 at ¶ 73; Doc. 52-1 at 49–53.  Dr. Wallinga wrote that East had "mild distress" because of his right great toe and that the toe "[c]ertainly continued to have an inflammatory response."  Doc. 52-1 at 51.  He noted mild swelling along both sides of the right great toe's nail but no significant drainage or redness.  Doc. 52-1 at 51; Doc. 50 at ¶ 73; Doc. 60 at ¶ 73.  Dr. Wallinga also noted that East's culture on May 29, 2018 showed "Staphylococcus aureus and Streptococcus agalactiae with no resistance of either organism," but that the results of East's most recent culture were still pending.  Doc. 51 at ¶ 74; Doc. 60 at ¶ 74; Doc. 52-1 at 52.  He told East to continue using the wheelchair, issued East a seven-day prescription for the antibiotic Levofloxacin, and submitted an authorization request for East to be evaluated by Dr. Pedersen.  Doc. 51 at ¶ 74; Doc. 60 at ¶ 74; Doc. 52-1 at 52.

---

[12]East claims that he went to sick call on June 18 and 19 but that the lines were too long for him to be seen.  Doc. 59 at ¶ 80.

On June 26, 2018, Health Services scheduled an appointment for Dr. Pedersen to see East at Avera Podiatry on July 2, 2018.  Doc. 51 at ¶ 74; Doc. 60 at ¶ 74.  Health Services informed East of this appointment on June 29, 2018, when issuing him his dose of antibiotics.  Doc. 51 at ¶ 76; Doc. 60 at ¶ 76.

Dr. Pedersen saw East as scheduled on July 2, 2018.  Doc. 51 at ¶ 77; Doc. 60 at ¶ 77; Doc. 52-1 at 56–60.  Dr. Pederson's notes from the appointment say that East was being seen for "chronic painful ingrown toenail medial border right big toe."  Doc. 52-1 at 58; Doc. 51 at ¶ 77; Doc. 60 at ¶ 77.  East also complained that he could feel the hardware under his skin on the right foot from previous arthrodesis and bone grafting.  Doc. 51 at ¶ 78; Doc. 60 at ¶ 78; Doc. 52-1 at 58.  Dr. Pedersen assessed East as having "prominent hardware" in his right foot from the August 2, 2017 surgery and an ingrown toenail in his right great toe with "no active signs of paronychia"[13] that day.  Doc. 52-1 at 59; Doc. 51 at ¶ 77; Doc. 60 at ¶ 77.  He thought the prominent screws in East's right foot were from bone atrophy after the surgery and told East they would not remove the hardware unless it became painful or caused ulcerations.  Doc. 52-1 at 58–59; Doc. 51 at ¶ 78; Doc. 60 at ¶ 78.  He also discussed the options for treating the ingrown toenail with East, including "wound care and oral antibiotics, avulsion, or matrixectomy."  Doc. 52-1 at 59; Doc. 59 at ¶ 84.  Dr. Pedersen wrote that East "elect[ed] to proceed with the matrixectomy" that day.  Doc. 52-1 at 59.  In East's case, this procedure involved anesthetizing his right great toe with a local anesthetic, removing part of the toenail, and applying a chemical to prevent the removed portion of the toenail from growing back.  Doc. 52-1 at 59.  Dr. Pedersen sent postoperative instructions to MDSP and wrote that he would see East in two weeks for a recheck.  Doc. 52-1 at 59.

---

[13]Paronychia is "an often tender infection or inflammation around the base of the nail fold." American Osteopathic College of Dermatology, Paronychia Nail Infection, aocd.org/page/ParonychiaNailInfe? (last visited Sept. 30, 2020).

East claims that Dr. Pedersen made some additional statements during the July 2 appointment. According to East, Dr. Pedersen said that the infection in his right great toe was "too deep," "'needed' to be cut out," and required an "onsite surgical procedure." Doc. 59 at ¶¶ 84–85. East alleges that Dr. Pedersen's medical opinion was that he "should 'elect' to proceed with [the] matrixectomy." Doc. 59 at ¶ 84. None of these statements East alleges Dr. Pedersen made appear in Dr. Pederson's notes from the July 2 appointment.[14] See Doc. 52-1 at 56–60.

Nurse Tycz met with East at MDSP on July 2 to discuss Dr. Pedersen's recommendations for foot soaks and dressing changes on East's right great toe. Doc. 51 at ¶ 80; Doc. 60 at ¶ 80. She also told East that the x-rays of his right toe showed no fracture so there was no need for him to continue using the wheelchair. Doc. 51 at ¶ 81; Doc. 60 at ¶ 81; Doc. 52-1 at 61. East said that his pain was "manageable" and walked back to the unit "with no further concerns." Doc. 51 at ¶ 81; Doc. 60 at ¶ 81; Doc. 52-1 at 61.

East had a follow up appointment with Dr. Pedersen on July 16, 2018. Doc. 51 at ¶ 83; Doc. 60 at ¶ 83; Doc. 52-1 at 65–68. He reported that his right great toe felt "a whole lot better." Doc. 52-1 at 66; Doc. 51 at ¶ 83; Doc. 60 at ¶ 83. The toe showed "healthy granulation tissue" in the medial corner and no cellulitis, malodor, or toenail regrowth. Doc. 51 at ¶ 84; Doc. 60 at ¶ 84; Doc. 52-1 at 67. Dr. Pedersen ordered that East continue with the foot soaks and dressing changes over the next two weeks and wrote that the toe should "heal up uneventfully" during this time. Doc. 52-1 at 68–69; Doc. 51 at ¶ 84; Doc. 60 at ¶ 84. During the appointment, East told Dr. Pedersen that the hardware in his foot was now at a two or three on the pain scale. Doc. 52-1 at

---

[14]Paragraph 79 of Defendants' statement of undisputed material facts states that "there is absolutely no support for the assertion by East that 'at this appointment it was determined the infection was too deep and required an on-site surgical procedure.'" Doc. 51 at ¶ 79. East cites Rule 56(d) and says that he needs to depose Dr. Pedersen to be able to appropriately respond to ¶ 79. This Court takes East's allegations as true so no discovery on this issue is necessary.

67. Dr. Pedersen told East again that they would not remove the hardware unless it was painful or causing ulcerations. Doc. 52-1 at 68; Doc. 51 at ¶ 85; Doc. 60 at ¶ 85. It was up to East, Dr. Pedersen said, how much the pain was bothering him. Doc. 52-1 at 68. East commented that he did not want to leave prison with a medical problem, and Dr. Pedersen replied that they would deal with it "when there is a problem." Doc. 52-1 at 68; Doc. 51 at ¶ 85; Doc. 60 at ¶ 85.

East did not complain any further about his right great toe. Doc. 51 at ¶ 86; Doc. 60 at ¶ 86. Some weeks thereafter, he was seen walking laps on the unit as well as the track at the recreation yard.[15] Doc. 51 at ¶ 86; Doc. 60 at ¶ 86.

### C. January 17, 2019 to Present

On January 17, 2019, East went to the hospital in Yankton, South Dakota, to receive a custom orthotic for his right foot. Doc. 59 at ¶ 92; Doc. 1 at ¶ 63. Corrections Officers John Ahrens and Marc Mastalir drove East and five other inmates in a van. Doc. 51 at ¶ 87; Doc. 60 at ¶ 87; Doc. 59 at ¶ 92. DOC "policy, procedure, and/or custom" dictates that corrections officers are to assist inmates in and out of transportation vehicles to prevent injury. Doc. 1 at ¶ 66; Doc. 15 at ¶ 63. According to East, however, he did not receive any assistance when exiting the van at the hospital. Doc. 59 at ¶¶ 95–97. He claims that Officer Ahrens failed to pull out the step stool that was in the van even though he and the other inmates were handcuffed and belly chained. Doc. 59 at ¶ 96. The first two inmates thus jumped out of the van, but East hesitated when it was his turn. Doc. 59 at ¶ 96; Doc. 1 at ¶ 69. He says that he tried but failed to reach the ground with his left foot and that Officer Ahrens then said, "Let[']s go." Doc. 59 at ¶ 96. As East tells it, he jumped from the van, "almost fell on the ice/snow," and began feeling pain in his right foot

---

[15]East does not dispute that he was seen walking on the unit and the track but points out that the report of this activity was filed on August 23, 2018. Doc. 52-1 at 70. The report does not make clear when East began walking laps.

immediately.  Doc. 59 at ¶ 96; Doc. 60 at ¶ 91.  At that point, Officer Mastalir retrieved the step

stool and helped the three remaining inmates out of the van.  Doc. 59 at ¶ 96.[16]

East asked to use the bathroom once inside the hospital.  Doc. 59 at ¶ 99.  Officer Ahrens

let him but did not uncuff his hands.  Doc. 59 at ¶ 100; Doc. 15 at ¶ 71.  According to East, DOC

policy allows corrections officers to uncuff one hand so the inmate can clean himself after using

the bathroom.  Doc. 1 at ¶ 72.  East claims that he asked Officer Ahrens how he was supposed to

wipe, and that Officer Ahrens said it was "[n]ot my problem, figure it out."  Doc. 59 at ¶ 101.  East

tried to wipe but could not.  Doc. 59 at ¶ 101.  He then asked Officer Ahrens for help pulling up

his pants, but Officer Ahrens refused.  Doc. 59 at ¶ 103; Doc. 15 at ¶ 74.  East alleges that he

resorted to "jumping up and down" to get his pants up and that this caused further pain in his foot.

Doc. 59 at ¶ 105.  Officer Mastalir saw what was happening and pulled East's pants up.  Doc. 59

at ¶ 105.  East alleges that he had to "sit in my own fecal matter for over 3 hours" because he was

unable to wipe.  Doc. 59 at ¶ 101.

East was fitted for a custom orthotic while at the hospital on January 17.  When he arrived

back at MDSP, Officer Mastalir strip searched him and cuffed his hands behind his back.  Doc. 59

at ¶¶ 108, 112; Doc. 60 at ¶ 112.  This is standard procedure for inmates returning from medical

appointments.  Doc. 59 at ¶ 112.  The inmates remain handcuffed until a corrections officer escorts

them through the second fence at MDSP.  Doc. 59 at ¶ 112.  In East's account, he "immediately"

said the handcuffs hurt and offered to go without a coat if that would make the handcuffs less

---

[16]Officers Ahrens and Mastalir offer a different version of East's exit from the van.  They claim
that Officer Ahrens "inadvertently" forgot to pull out the step stool and that they do not remember
East having jumped from the van.  Docs. 45, 47.  Officer Ahrens claims that Officer Mastalir was
able to place the footstool in front of the van before East exited it.  Doc. 45 at ¶ 9.

tight.[17]  Doc. 59 at ¶ 108; Doc. 60 at ¶ 112.  East claims that Officer Mastalir refused to loosen the cuffs, saying that they were "just going through the fence."  Doc. 59 at ¶ 108.  East's hands were uncuffed once he was inside MDSP.  Doc. 59 at ¶ 112.  He estimates that he was handcuffed for approximately ten to fifteen minutes.[18]  Doc. 59 at ¶ 111.

When inmates return from a medical trip as East had, they are taken to the MDSP medical center to review their paperwork with a nurse.  Doc. 59 at ¶ 112.  East claims that he was sitting in the medical center waiting room when corrections officer Abby Dickes said, "Jesus Christ who cuffed you?"  Doc. 59 at ¶ 112; Doc. 60 at ¶ 108.  East alleges that he was in pain and that his hands were "dead purple and bright red" where he was cuffed.  Doc. 59 at ¶ 112.[19]

East went to sick call on the afternoon of January 17, 2019, to complain that he may have injured his right foot when he jumped out of the van.  Doc. 52-1 at 72; Doc. 59 at ¶ 116.  East reported increased pain in his right foot, that the screw in the foot felt like it was about to burst through the skin, and that his right toenail was bleeding.  Doc. 52-1 at 72.  Nurse Tycz noted that the medial top of East's right foot was discolored (purplish) and extremely tender to touch.  Doc. 52-1 at 74.  His right toe showed a "very scant amount of serosang drainage" but no swelling, warmth, or redness.  Doc. 52-1 at 74.  Nurse Tycz discussed East's foot with PA Karissa Zimmer, who ordered that East undergo an x-ray that evening, be provided with a wheelchair and walking boot for two weeks, and return for a recheck on January 21, 2019.  Doc. 52-1 at 74, 76; Doc. 51 at

---

[17]Officer Mastalir does not recall East complaining that the handcuffs were too tight.  Doc. 51 at ¶ 112.
[18]It appears that this ten to fifteen minutes in handcuffs resulted from corrections officers having to strip search and handcuff two other inmates before they escorted East through the fence.  Doc. 59 at ¶ 110.
[19]Officer Dickes filed an affidavit saying that she asked East about his hands after she saw him rubbing them, that she noticed a slight discoloration of East's hands but that this could have been due to the cold temperature outside, and that she did not believe East needed any medical attention for his hands.  Doc. 42.

¶ 102; Doc. 60 at ¶ 102.  Nurse Tycz wrote that East had been ordered Tylenol that morning and that he could use that for his pain.  Doc. 52-1 at 74.  The record from this visit does not mention any pain in East's hands or wrists.

East returned to sick call on January 18, 2019, complaining that his hands and wrists had been hurting and tingling since being handcuffed the day before.  Doc. 52-1 at 83; Doc. 51 at ¶ 117; Doc. 60 at ¶ 117.  East said that he had Raynaud's Syndrome and that his fingers usually tingle, but that the tingling was worse now.  Doc. 52-1 at 83.  Nurse Brittney Huber wrote that East did not appear to be in any distress and that he wheeled his wheelchair back to the exam room without any facial grimacing.  Doc. 52-1 at 83.  East claims that he wheeled himself with his left foot, not his hands.  Doc. 59 at ¶ 122.  Nurse Huber noted that East had a quarter-sized bruise on the inside of his left wrist, that his hands were cold and pink, that he had strong and equal grasps, and that his capillary refill was more than three seconds.  Doc. 52-1 at 83.  She wrote that she told East to keep monitoring his hands and wrists and to notify Health Services if anything changed.  Doc. 52-1 at 83.  According to East, however, Nurse Huber actually told him there was nothing they could do and that he should return to Health Services in one to two weeks if his wrists and hands did not improve.  Doc. 59 at ¶¶ 120–21.  Nurse Huber spoke with Dr. Wallinga about East and he ordered that soft cuffs be used because of East's Raynaud's disease.[20]  Doc. 51 at ¶ 120; Doc. 60 at ¶ 120; 52-1 at 84–87.

East returned to Health Services on January 21, 2019 for a recheck of his right foot.  Doc. 52-1 at 77.  He said that his pain was "8/10" and that he believed his foot was worsening.  Doc.

---

[20]East acknowledges that the medical record says that Nurse Huber placed an order for the provider to "review chart" and that she met with Dr. Wallinga and received a "verbal order regarding: soft cuffs due to" Raynaud's disease.  Doc. 60 at ¶ 120.  However, East disputes that Nurse Huber forwarded his complaints to the provider or discussed his complaints with the provider.  Doc. 60 at ¶ 120; Doc. 59 at ¶ 121.

52-1 at 77.   He asked that Dr. Pedersen review his most recent x-rays.  Doc. 52-1 at 77.  Nurse

Tycz noted a bulge and discoloration on the top of East's foot where the hardware was located.

Doc. 52-1 at 77.   She also wrote that East's right great toe was "ingrown and draining" but that

there was no sign of infection.  Doc. 52-1 at 77.  Nurse Tycz told East to apply bacitracin to his

great right toe and said she would speak with Dr. Wallinga about having Dr. Pedersen review his

x-rays.  Doc. 52-1 at 77; Doc. 51 at ¶ 104; Doc. 60 at ¶ 104.  East claims that he also complained

of pain in his hands and wrists and that Nurse Tycz told him to return in one week if they did not

improve.  Doc. 59 at ¶ 132.  The medical record from this appointment does not mention East

complaining about his hands and wrists.  Doc. 52-1 at 77–78.

On Dr. Wallinga's orders, Nurse Tycz sent East's x-rays to Dr. Pedersen for review.  Doc.

51 at ¶ 104; Doc. 60 at ¶ 104; Doc. 52-1 at 79.   East claims that Health Services did not inform

Dr. Pedersen of the bulge and discoloration on top of his foot, however.  Doc. 60 at ¶ 105.  Dr.

Wallinga called Nurse Tycz on January 22, 2019, to tell her that Dr. Pedersen had reviewed the x-

rays and stated that "the hardware is intact, and everything is stable."  Doc. 52-1 at 80; Doc. 51 at

¶ 105; Doc. 60 at ¶ 105.  When Nurse Tycz informed East of this, he replied: "Now that I think

about it, Ya know.  I don't exercise or anything.  I was just freaking out and started noticing things

that I thought weren't there before.  As long as [Dr. Pedersen] states everything is fine then that is

good."  Doc. 52-1 at 80; Doc. 51 at ¶ 106; Doc. 60 at ¶ 106.  Nurse Tycz told East that he could

slowly transition out of the wheelchair and boot, that he could take Tylenol for pain, and that he

should notify medical if his symptoms worsened.  Doc. 52-1 at 80; Doc. 59 at ¶ 133.

East sent a kite-request slip on January 25, 2019, complaining that he still had pain in his

hands and wrists.  Doc. 41-44; Doc. 51 at ¶ 121; Do. 60 at ¶ 121.  When seen by Nurse Diana

Teadtke that day, East reported that his pain began last week when he was handcuffed, that his

wrists were cracking, and that he had numbness and tingling in his hands. Doc. 52-1 at 88; Doc. 51 at ¶ 121; Do. 60 at ¶ 121. Nurse Teadtke examined East and found a small nickel-sized bruise on his right wrist, but no swelling, deformity, tenderness, or loss of motion. Doc. 52-1 at 89; Doc. 51 at ¶ 122; Do. 60 at ¶ 122. She told East to continue using Tylenol for pain, to use warm water for his cold hands, that his Raynaud's disease could be worse with colder temperatures, and that she would check with the provider for any further recommendations. Doc. 52-1 at 90; Doc. 51 at ¶¶ 122–23; Doc. 60 at ¶¶ 122–123. According to East, Nurse Teadtke told him that the handcuffs may have exacerbated his Raynaud's disease. Doc. 59 at ¶ 134. East received a message from Health Services later that day saying that a provider had reviewed his chart, that he should keep his hands warm "due to Reynaud's [sic]" and that nursing would recheck him in two to three weeks. Doc. 59-1 at 80.

East submitted a kite-request slip on February 8, 2019, complaining that no one had given him a diagnosis for his foot and that his hands and wrists had not improved. Doc. 52-1 at 93. Doc. 51 at ¶ 124; Doc. 60 at ¶ 124. East wrote that his hands fell asleep frequently, that even lifting his remote "sometimes hurts really bad," and that he was concerned about the bulge in his right foot. Doc. 52-1 at 93. Health Services arranged for East to see PA Zimmer that day. Doc. 51 at ¶ 125; Doc. 60 at ¶ 125.

East told PA Zimmer that he injured his right foot jumping out of the van and that the pain had now resolved. Doc. 52-1 at 97; Doc. 51 at ¶ 132; Doc. 60 at ¶ 132. However, East reported that he had new numbness in the foot and that he still had a bony prominence and discoloration. Doc. 52-1 at 97; Doc. 51 at ¶ 132; Doc. 60 at ¶ 132. East now maintains that the numbness in his foot was the reason his pain had resolved. Doc. 60 at ¶ 132. East also reported wrist pain and hand numbness that was worse in the cold and that his hands sometimes hurt and shook with

24

activity. Doc. 52-1 at 97. PA Zimmer examined East's foot and wrote that he had a "bony prominence and scar over the mid/medial from a previous surgery," no tenderness, and "monofilament 1/10 intact for sensation." Doc. 52-1 at 99. She noted that Dr. Pedersen had reviewed the January 18, 2019 x-ray of East's foot and that this x-ray "was negative for acute issues and was stable compared to previous." Doc. 52-1 at 97; Doc. 51 at ¶ 133; Doc. 60 at ¶ 133. PA Zimmer also examined East's hands and wrists, noting "1/5 strength for hand grip," "5/5" finger abduction/adduction, and reduced active flexion in East's wrists. Doc. 52-1 at 99; Doc. 60 at ¶ 126.

PA Zimmer diagnosed East with a "contusion" of the foot and "[p]ain in hand and fingers." Doc. 52-1 at 99. She told East to take a B12 vitamin and acetyl-L-carnitine supplement and gave him gentle range of motions exercises for his hands and wrists. Doc. 52-1 at 99. She also told East to take Etodolac[21] for thirty days with food and to notify staff immediately if his stomach became upset. Doc. 52-1 at 99; Doc. 59 at ¶ 143.

According to East, PA Zimmer told him that he had "possible further nerve damage" in his foot. Doc. 59 at ¶ 144. He claims that PA Zimmer told him that either this nerve damage or the aggravation of his Reynaud's from being improperly handcuffed was causing the numbness in his foot. Doc. 59 at ¶ 144. Like many of East's other claims about what medical providers told him, any such statement by PA Zimmer is not noted in the medical records. In fact, PA Zimmer filed an affidavit saying that there was no basis in the medical records for East's assertion that nerve damage was causing his numbness. Doc. 46 at ¶¶ 5, 7.

---

[21]Etodolac is nonsteroidal anti-inflammatory (NSAID) drug used to relieve pain. WebMD, https://www.webmd.com/drugs/2/drug-214-428/etodolac-oral/etodolac-oral/details (last visted Sept. 30, 2020).

East went to sick call on the morning of February 11, 2019, to ask whether it was safe for him to take Etodolac. Doc. 59-1 at 129. According to East, Etodolac's "generic ingredient" is ibuprofen, and it had been recommended that he avoid ibuprofen. Doc. 59 at ¶ 147. A nurse reeducated East on how PA Zimmer had addressed his NSAID concerns and told him that he was only taking the Etodolac short term, could stop at any time, and should notify nursing of any problem. Doc. 59-1 at 129; Doc. 59 at ¶ 148.

East took the Etodolac later that morning. Doc. 59 at ¶ 150. He returned to Health Services the next day saying that he experienced severe stomach pain and bloody stools after taking the Etodolac though he eventually felt better. Doc. 59-1 at 128–29. East told the nurse that he "knew that this was going to happen" and that he told the provider he couldn't take ibuprofen. Doc. 59-1 at 128–129. The nurse called East back to medical that day and told him that PA Zimmer had switched him over to Celebrex for pain management and placed him on Prilosec for stomach issues. Doc. 59-1 at 128–29; Doc. 59 at ¶ 152. East claims that the Celebrex still caused him pain, but that he was "able to tolerate it." Doc. 59 at ¶ 154.

East wrote a kite-request slip to Warden Fluke on February 12, 2019, complaining about the medical treatment he was receiving for his foot, hands, and wrists, asking to see Dr. Pedersen, and saying that he had filed grievances against Ahrens and Mastalir, whom he believed acted inappropriately on January 17. Doc. 59-1 at 87–88. Warden Fluke responded to East a few days later, explaining that he had tried to speak with East but that East was not in his bunk, that DOC would take action if it discovered an officer engaged in misconduct, that Health Services handled medical care, and that East could not select his own provider. Doc. 59-1 at 89.

East submitted a kite-request slip on May 17, 2019, complaining that the bony prominence on his right foot had worsened, that the "wound" on his right toe still hadn't healed, that his hands

and wrists had not improved, that he had been losing feeling in both arms, and that he urinated himself "because of loss of feeling." Doc. 41-69; Doc. 60 at ¶ 127.  Nurse Fejfar saw him that same day.  Doc. 41-70.  East said that some feeling had returned to his right foot and that he now had pain around the bony prominence and whole inside of the foot although it wasn't really painful to walk.  Doc. 41-70 at 1; Doc. 51 at ¶ 137; Doc. 60 at ¶ 137.  He also reported that his right toe had not healed despite putting bacitracin on it since January, having episodes of no feeling in his arms over the last few weeks, and urinating himself when he used the restroom at night and would think he was finished.  Doc. 41-70 at 2.

Nurse Fejfar noted that East had a slight limp with ambulation and that the skin over the bony prominence on his right foot was slightly discolored.  Doc. 41-70 at 3.  His great right toe had a small open area of red granulation tissue but was not swollen, and he had a normal range of motion in his hands and arms.  Doc. 41-70 at 3.  Nurse Fejfar took a urine sample from East and obtained a culture of his great right toe.  Doc. 41-70 at 3.  She also prescribed him Tylenol for pain, told him to apply a warm compress to the top of his right foot four times a day, and instructed him to return to the clinic if his symptoms worsened.  Doc. 41-70 at 3.

Health Services had East see PA Zimmer on May 23, 2019.  Doc. 59 at ¶ 161; Doc. 52-1 at 152.  East complained of the bony prominence on his right foot and a "small black spot" on the skin overlying it, his right great toenail, losing feeling in his arms, urinary incontinence, an episode of bowel incontinence, back pain, and snoring.  Doc. 52-1 at 152–53.  PA Zimmer recommended that East undergo a digital rectal exam to check his sphincter tone.  Doc. 51 at ¶ 160; Doc. 60 at ¶ 160; Doc. 52-1 at 153.  East asked whether it was legal for female medical professionals to give male patients a rectal exam in the prison setting.  Doc. 52-1 at 153; Doc 59 at ¶ 166; Doc. 60 at ¶ 164.  PA Zimmer explained that she was recommending the rectal exam because of his complaint

27

of back pain and fecal incontinence and told him that the gender of the provider and patient was irrelevant.[22]  Doc. 52-1 at 153; Doc. 51 at ¶ 162; Doc. 60 at ¶ 162.  According to PA Zimmer, East initially refused the exam but then consented and made "several legal comments."  Doc. 52-1 at 153; Doc. 51 at ¶ 164; Doc. 60 at ¶ 164.  PA Zimmer asserts that she proceeded to reiterate why the exam was recommended, told East that she was in no way forcing him to undergo the exam, and explained that if he declined the exam he would need to sign a release of responsibility to document that he was refusing an exam that was medically recommended.  Doc. 46 at ¶¶ 11, 13; Doc. 51 at ¶¶ 164, 166.  East has a different version of this discussion.  He claims that PA Zimmer told him she would not do the exam if he was uncomfortable with it, but that he would need to sign a refusal form.  Doc. 59 at ¶ 166.  East says he then asked for a male to perform the exam and PA Zimmer replied that he had two options: "[O]ne you let me stick my finger up your butt and sign a consent form, so I can't be held liable, or you sign a refusal form stating you are refusing medical treatment."  Doc. 59 at ¶ 166.  East claims that he didn't want to risk "losing" his appointment with Dr. Pedersen and that PA Zimmer "was asking me to refuse all medical treatment not just this one exam."  Doc. 59 at ¶ 166.  It is undisputed that East told PA Zimmer that he would sign the consent form because he didn't want to refuse "any medical treatment."  Doc. 51 at ¶ 167; Doc. 60 at ¶ 167.  PA Zimmer performed the exam and found that East's rectal tone was normal. Doc. 52-1 at 155.

East's neurological exam on May 23 was normal.  Doc. 52-1 at 155.  PA Zimmer's examination of East's right foot that day showed a bony prominence with the overlying skin being "hypopigmented" and decreased sensation throughout the foot.  Doc. 52-1 at 154.  PA Zimmer

---

[22]PA Zimmer filed an affidavit explaining that she also told East that the exam was necessary to rule out "emergent/urgent pathology," Doc. 46 at ¶ 12, but East denies this, Doc. 59 at ¶¶ 308–09.

suspected that the skin changes and bony prominence were chronic but recommended a follow up with podiatry given East's "persisting complaints." Doc. 52-1 at 155; Doc. 51 at ¶ 141; Doc. 60 at ¶ 141. The culture of East's great right toenail showed a staph and strep infection, so PA Zimmer prescribed the antibiotic Keflex. Doc. 52-1 at 152, 155. She also ordered an x-ray of East's foot, stomach, spine, and kidneys, a urine test, some blood tests, and that East be referred for an MRI given his history of spina bifida and his new bladder incontinence. Doc. 52-1 at 155; Doc. 59 at ¶ 165.

The x-rays showed that East's foot had not changed since the last examination and that his abdomen was fine. Doc. 59 at ¶ 171; Doc. 15 at ¶ 122. However, there were some premature degenerative changes seen at East's lumbosacral junction. Doc. 59 at ¶ 171; Doc. 15 at ¶ 122.

East went to Health Services on the morning of May 24, 2019, for a blood draw. Doc. 59 at ¶ 173; Doc. 41-78. The record from this appointment says that the blood draw attempted that morning was difficult, so East was told to increase his fluid intake and return later. Doc. 41-78; Doc. 51 at ¶¶ 168–69; Doc. 60 at ¶¶ 168–69. Health Services completed the blood draw without any difficulty that afternoon.[23] Doc. 41-78; Doc. 51 at ¶ 168; Doc. 60 at ¶ 168. East claims that the blood draw attempted in the morning caused him "extreme amounts of pain." Doc. 59 at ¶ 173. He asserts that Nurse Janelle Bastemeyer[24] and Nurse Klawitter each made three unsuccessful attempts to draw his blood, that they were "fishing" for his vein, and that he complained of pain but was ignored. Doc. 59 at ¶ 173. East claims that the nurses tried to draw his blood for forty-

---

[23]East interprets the results of this blood draw as showing that his kidney function "was below normal." Doc. 59 at ¶ 175. The lab results East cites do not appear to support this assertion, however. Doc. 59-1 at 94. East also alleges that PA Zimmer giving him Ibuprofen was the "proximate cause" of his kidney function being below normal. Doc. 1 at ¶ 134. East does not cite any evidence to support this assertion.
[24]Nurse Bastemeyer is identified as Nurse Jane Doe 3 in East's complaint. Doc. 1 at ¶ 130.

eight minutes and that he suffered "extreme bruising" as a result of the attempted blood draw. Doc. 59 at ¶¶ 173, 314. East's father filed an affidavit saying that East's arms were "severely bruised" when he visited East on June 1, 2019. Doc. 58 at ¶ 2.

On May 28, 2019, East filed an informal resolution request concerning the rectal exam PA Zimmer performed on him. Doc. 59-1 at 95. East mentioned being concerned about jeopardizing his appointment with Dr. Pedersen but did not claim that PA Zimmer asked him to sign a form refusing all medical treatment rather than just the rectal exam. Doc. 59-1 at 95. Nor did East critique how PA Zimmer performed the exam. Doc. 59-1 at 95. Instead, he asked that all future provider appointments be with a male. Doc. 59-1 at 95. MDSP staff responded a few days later explaining that PA Zimmer acted appropriately and that female providers seeing male patients is "common practice" in the community and not illegal. Doc. 59-1 at 96. MDSP denied East's request for a male doctor, writing that PA Zimmer "is our full time provider." Doc. 59-1 at 96.

East submitted a kite-request slip on June 3, 2019, complaining, among other things, that the bony prominence in his right foot had broken through the skin, that his infected great toe was still swollen, that he had bowel leakages, and that he urinated frequently and had urinary incontinence. Doc. 41-47 at 1–2; Doc. 51 at ¶¶ 127–28; Doc. 60 at ¶¶ 127–28. East wrote that he was concerned that Officer Mastalir's handcuffing of him was causing the bladder issues. Doc. 41-47 at 2; Doc. 60 at ¶ 127. Health Services saw East that day. Nurse Tycz noted a pin-point scab and chronic discoloration on the top of East's right foot but no swelling, drainage, or redness in his great right toe. Doc. 41-48 at 2. She told East that many of his issues would be addressed by the upcoming MRI and appointment with Dr. Pedersen, that there was no way to definitively say that the handcuffing incident was causing his problems, and that it was "unfair to make

assumptions." Doc. 41-48 at 3.  East agreed with this.  Doc. 41-48 at 3; Doc. 51 at ¶ 127; Doc. 60 at ¶ 127.

East saw Dr. Pedersen on June 10, 2019.  Doc. 59-2 at 3.  Dr. Pedersen reviewed East's May 23, 2019 x-rays and did not see any stress fractures or other abnormal etiology.  Doc. 59-2 at 4.  He could not tell whether the lump on East's right foot was from an exostosis or the hardware. Doc. 59-2 at 4.  Dr. Pedersen assessed East as having "retained surgical hardware first ray right foot with dorsal prominence with superficial healed ulcer" and an ingrown toenail with "mild paronychia."  Doc. 59-2 at 4.  He removed part of the ingrown toenail that day at the clinic.  Dr. Pedersen also told East that the lump on his foot would "continue to fester" until the "plate [or] exostosis" was removed.  Doc. 59-2 at 4.  According to Dr. Pedersen's notes, East wanted to move forward with surgery on his right foot.  Doc. 59-2 at 4–5.  MDSP scheduled to have Dr. Pedersen remove the hardware from East's right foot.

As East tells it, Dr. Pedersen said that MDSP should have told him about the bony prominence in East's foot when they sent him the x-rays in January 2019 because it was "'obvious' that it is not okay" and he should have seen East "right away."  Doc. 59 at ¶ 179.  Nothing close to these statements appear in Dr. Pedersen's notes from the June 10, 2019 appointment.  Doc. 59-2 at 3–7.  East also says that he was unsure about surgery on his right foot and only agreed to it when Dr. Pedersen said surgery was the only option.  Doc. 59 at ¶ 182.  However, Dr. Pedersen's notes from East's July 2018 appointment show that East had inquired about removal of the hardware and said that he did not want to leave prison with a medical problem.  Doc. 52-1 at 68.

East had an MRI on June 18, 2019, because of his spina bifida and bowel and bladder issues.  Doc. 59 at ¶ 184; Doc. 59-1 at 155.  The radiologist's impression from the MRI was that East had a "low lying/tethered spinal cord with conus medullaris extending to the L3-4 level with

31

an associated enlarging intradural lipoma." Doc. 59-1 at 156. He wrote "Spina bifida, follow-up bladder issues" in the portion of the medical record labeled "Indication." Doc. 59-1 at 155. A few days later, PA Zimmer issued an order for East to be scheduled to see a neurosurgeon concerning his "low lying tethered spinal co[rd] with associated enlarging [intradural] lipoma." Doc. 41-55 at 2.

On June 22, 2019, corrections officer Jeff Barta asked East whether he was still a disinfectant runner at MDSP and how many times a day he performed this duty.[25] Doc. 51 at ¶ 170; Doc. 60 at ¶ 170; Doc. 59 at ¶ 185. According to East, he explained that he only performed the job once a day because he has "prominent hardware in my foot and Foley the previous unit coordinator did not want me further injuring my foot." Doc. 59 at ¶ 185. East claims that he also explained that it was his "understanding that the new unit coordinator Tycz was under the same impression as Foley." Doc. 59 at ¶ 185. Officer Barta replied that East had to perform his duties as disinfectant runner more often.[26] Doc. 59 at ¶ 185. East alleges that he asked whether this could wait until after he had surgery on his foot but that Officer Barta said, "no, you have to do it." Doc. 59 at ¶ 185; Doc. 60 at ¶ 170.

East submitted a kite request-slip on June 24, 2019, complaining that Officer Barta told him he needed to do his job more often. Doc. 41-56; Doc. 51 at ¶ 171; Doc. 60 at ¶ 171. East wrote that he followed this order but that doing so injured his right foot. Doc. 41-56. He claimed that his right fourth toe was now bent 90 degrees to the left and had a smashed toenail and a wound with drainage, that his right third toe had a large yellow blister and discoloration under the nail,

---

[25]East's job as a disinfectant runner involved spraying tables and door handles with bleach. Doc. 41-57 at 1; Doc. 51 at ¶ 172; Doc. 60 at ¶ 172.
[26]Officer Barta submitted an affidavit averring that he was not aware of East's upcoming foot surgery, of any medical condition that would limit East's ability to perform his job, or of any work restrictions imposed by Health Services. Doc. 44 at ¶¶ 3–6.

and that the hardware or bony prominence issue on his great right toe "appears to be worse." Doc. 41-56 at 2. East also reported a "new issue," saying that he would drop his cup and not realize that he did so until it hit the floor and that he fell while putting his pants on the day before. Doc. 41-56 at 2.

Nurse Tycz saw East that same day. Doc. 41-57; Doc. 51 at ¶ 172; Doc. 60 at ¶ 172. She wrote that East did not currently have a work restriction and that he felt he could continue to work as a disinfectant runner if he could use a wheelchair. Doc. 41-57 at 1; Doc. 51 at ¶¶ 173, 176; Doc. 60 at ¶¶ 173, 176; see also Doc. 41-85. She noted continued discoloration on the skin overlying the top of East's foot, bruising on his third and fourth toes and nails, and "some flaking/callous area" on the tip of East's third toe. Doc. 41-57 at 2. East said that the issues with his third and fourth toe began yesterday "after walking around the unit all day." Doc. 41-57 at 2; Doc. 51 at ¶ 175; Doc. 60 at ¶ 175. Nurse Tycz assessed East as having "complications following increased activity over the weekend." Doc. 41-57 at 2. She told East that Health Services would "review the use of a wheelchair for long distances and with work duties to prevent the worsening of his right foot" and that the podiatrist could further evaluate his foot at the next appointment. Doc. 41-57 at 3.

On June 24, 2019, East spoke with Unit Coordinator Tycz[27] about Officer Barta. Doc. 59 at ¶ 190; Doc. 59-1 at 99–100. According to East, Unit Coordinator Tycz said that Medical was upset about the incident with Officer Barta and that Tycz had already spoken to Officer Barta to ensure that it wouldn't happen again. Doc. 59 at ¶ 190. East avers that Unit Coordinator Tycz made clear that he did not want to cause East "further injury." Doc. 59 at ¶ 190.

---

[27]Nurse Tycz and Unit Coordinator Tycz are separate people.

Nurse Tycz asked Dr. Pedersen's office whether East should be "weight bearing" and whether he should be using crutches or a wheelchair. Doc. Doc. 41-79; Doc. 51 at ¶ 178; Doc. 60 at ¶ 178.  On June 25, 2019, Nurse Tycz told East that Dr. Pedersen had recommended he use a wheelchair for long distances until after surgery and to avoid tight shoes and the "pressure point from hardware" on his right foot. Doc. 60 at ¶ 179; Doc. 51 at ¶ 179; Doc. 52-1 at 122.  East told Nurse Tycz that he decided to resign from his job until his foot healed. Doc. 52-1 at 122.  East agrees that Health Services spoke to Dr. Pedersen about the increased pain in his right foot, but alleges that Health Services failed to tell Dr. Pedersen about the bruising and "complications" with his third and fourth toe. Doc. 60 at ¶ 156.

Health Services saw East for complaints of back pain on June 27 and 28, 2019. Doc. 41-60; Doc. 41-61.  He did not mention anything further about his right foot during these appointments. Doc. 51 at ¶ 180; Doc. 60 at ¶ 180.

PA Zimmer saw East on July 15, 2019, to evaluate him before his foot surgery. Doc. 41-62; Doc. 51 at ¶ 147; Doc. 60 at ¶ 147.  She wrote that East continued to have pain in his right foot but that he walked into the room without distress that day, leaving his wheelchair in the lobby. Doc. 41-62 at 2.  East's gait was within normal limits and the examination of his extremities was normal. Doc. 41-62 at 3–4.  PA Zimmer wrote that East had "known spina bifida with recent MRI unchanged, although with the [bladder] incontinence we are working on getting him a neurosurgical eval." Doc. 41-62 at 2.

Dr. Pedersen surgically removed the hardware from East's foot on July 17, 2019. Doc. 51 at ¶ 148; Doc. 60 at ¶ 148; Doc. 41-64.  He wrote that the "soft tissue was easily dissected free from the surgical plate," that "all screws [were] removed without problems," that the bone "had successful arthrodesis," and that there were no signs of infection. Doc. 41-64 at 1; Doc. 51 at ¶¶

34

148–49; Doc. 60 at ¶¶ 148–49. According to East, Dr. Pedersen said the hardware had caused the bulge in East's right foot. Doc. 59 at ¶ 197. Dr. Pedersen said that East could walk for one or two minutes at a time over the next week and that he should return for a recheck in two to three weeks. Doc. 41-75 at 1; Doc. 51 at ¶ 149; Doc. 60 at ¶ 149.

True to pattern, East claims that Dr. Pedersen made some statements on July 17, 2019, that do not appear in the medical records. As East tells it, Dr. Pedersen was upset about "the fourth toe issue and it being under the third toe." Doc. 59 at ¶ 201. He claims that Dr. Pedersen said they would have to wait until after the operation to deal with the fourth toe because MDSP did not tell him about it sooner. Doc. 59 at ¶ 201.

East returned to Dr. Pedersen on August 2, 2019, for a post-operation checkup. Doc. 52-1 at 141. East had no complaints or pain, and the incision had healed. Doc. 52-1 at 141–43; Doc. 51 at ¶ 150; Doc. 60 at ¶ 150. However, East did report that he was still "having difficulties with plantar flexed fourth digit hammertoe right foot." Doc. 52-1 at 141. Dr. Pedersen wrote that East "has been taping the 2 toes together and thinks it feels better" and that he was "curious about treatment options." Doc. 52-1 at 141. Dr. Pedersen assessed East as having "plantar flexion contracture fourth digit right foot/hammertoe." Doc. 52-1 at 142. He placed a bolster pad under East's right fourth toe to see if that would relieve East's symptoms and perhaps "retrain[]" the toe "not to be so plantarflexed." Doc. 52-1 at 142. He also ordered MDSP to x-ray East's right foot in two weeks to ensure that there were no stress fractures from the hardware removal. Doc. 52-1 at 142.

MDSP took x-rays of East's right foot on August 9, 2019. Doc. 51 at ¶¶ 152–54; Doc. 60 at ¶¶ 152–54. They showed no "fracture, dislocation, or other acute osseous abnormality" and "[s]table postsurgical changes." Doc. 41-77. East agrees that his foot healed properly from the

surgery and that Dr. Pedersen did not make any further recommendations regarding removal of the hardware from the foot. Doc. 51 at ¶¶ 155, 159; Doc. 60 at ¶¶ 155, 159.

East filed suit[28] under § 1983 against Wardens Robert Dooley and Brent Fluke, PA Adams, PA Zimmer, Nurse Klawitter, Nurse Huber, Nurse Bastemeyer, Nurses Jane Doe 1 and 2, and Officers Ahrens, Barta, and Mastalir. Doc. 1. He sued these Defendants in both their official and individual capacities and pleaded three counts. Doc. 1 at ¶ 12. Count 1 alleged that PA Adams, PA Zimmer, and Nurses Klawitter, Huber, Bastemeyer, and Jane Doe 1 and 2 violated his Eighth Amendment rights by being deliberately indifferent to his serious medical needs. Doc. 1 at ¶¶ 154–58. Count 2 alleged that Officers Ahrens, Barta, and Mastalir violated his Eighth Amendment rights by, among other things, the "unnecessary and wanton infliction of pain," using unnecessary force, and failing to protect him from a substantial risk of serious harm. Doc. 1 at ¶¶ 159–162. Count 3 alleged that Wardens Fluke and Dooley established a policy or custom of deliberate indifference. Doc. 1 at ¶¶ 163–66.

## III.   Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(a) places the burden initially on the moving party to establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). Once the moving party has met that burden, the nonmoving party must establish that a material fact is genuinely disputed either by "citing to particular parts of materials in the

---

[28]In January of 2020, East wrote a letter to Defendants' attorney offering to dismiss this case if the State agreed to commute his sentence and transport him to Poland. Doc. 66-2.

record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B); <u>Gacek v. Owens & Minor Distribution, Inc.</u>, 666 F.3d 1142, 1145−46 (8th Cir. 2012); <u>see also</u> <u>Mosley v. City of Northwoods</u>, 415 F.3d 908, 910 (8th Cir. 2005) (stating that a nonmovant may not merely rely on allegations or denials). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in his pleading, but must set forth specific facts showing that there is a genuine issue for trial. <u>Gacek</u>, 666 F.3d at 1145. In ruling on a motion for summary judgment, the facts and inferences fairly drawn from those facts are "viewed in the light most favorable to the party opposing the motion." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587−88 (1986) (quoting <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (per curiam)).

## IV.   Analysis

### A. Section 1983

Section 1983 provides a cause of action against any "person' who, acting "under color of" state law, deprives the plaintiff of "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. State employees like Defendants may be sued under § 1983 in their individual capacities, their official capacities, or both. <u>Johnson v. Outboard Marine Corp.</u>, 172 F.3d 531, 535 (8th Cir. 1999). Here, East is suing all Defendants in both their individual and official capacities. Doc. 1 at ¶ 12. As explained more fully below, individual and official capacity suits differ in both their pleading requirements and the defenses available to the official. <u>See</u> <u>Hafer v. Melo</u>, U.S. 21, 25 (1991). Because of these differences, this Court will analyze East's individual capacity and official capacity claims separately.

### B. Official Capacity Claims

East's claims seeking damages from all the Defendants in their official capacities must be dismissed. First, § 1983 only provides a cause of action against a "person" who, acting under the color of state law, deprives another of his or her federal constitutional or statutory rights. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). The Supreme Court in Will held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983" when sued for money damages. Id. Section 1983 therefore does not allow East to sue the Defendants for damages in their official capacities. Id.; see also Arizonans for Official English v. Arizona, 520 U.S. 43, 69 n.24 (1997) ("State officers in their official capacities, like States themselves, are not amenable to suit for damages under § 1983."). Second, absent consent by the state or congressional abrogation of immunity, the Eleventh Amendment generally bars federal-court lawsuits seeking monetary damages from states or individual state officers in their official capacities. Will, 491 U.S. at 66; Edelman v. Jordan, 415 U.S. 651, 662–63 (1974); Trevelen v. Univ. of Minn., 73 F.3d 816, 818 (8th Cir. 1996). Section 1983 did not abrogate South Dakota's Eleventh Amendment immunity, Quern v. Jordan, 440 U.S. 332, 345 (1979), South Dakota has not consented to official capacity suits for money damages under § 1983, and the Defendants have raised Eleventh Amendment immunity as a defense in this case, Doc. 41 at 3–4. The Defendants are entitled to judgment as a matter of law on East's claims seeking money damages from them in their official capacities.

### C. Individual Capacity Claims, Qualified Immunity, and Deliberate Indifference

The doctrine of qualified immunity is a defense available to state officials sued in their individual capacities under § 1983. This doctrine "shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or

statutory right of which a reasonable person would have known." Partlow v. Stadler, 774 F.3d 497, 501 (8th Cir. 2014). Courts use a two-step inquiry to determine whether qualified immunity applies: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Id. Plaintiffs must meet both steps to defeat qualified immunity, and courts can begin (and perhaps end) with either step. Greenman v. Jessen, 787 F.3d 882, 887 (8th Cir. 2015).

East's principal claim against all Defendants—other than Officers Ahrens, Barta, and Mastalir—involves what, generally speaking, is a clearly established right. "The Eighth Amendment prohibition on cruel and unusual punishment protects prisoners from deliberate indifference to serious medical needs." Laganiere v. Cty. of Olmsted, 772 F.3d 1114, 1116–17 (8th Cir. 2014). A plaintiff who claims that a defendant was deliberately indifferent to his medical needs must show that he suffered "an objectively serious medical need, and that the 'defendant actually knew of, but deliberately disregarded, such need.'" Id. (quoting McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009)); see also Farmer v. Brennan, 511 U.S. 825, 837 (1994) (holding that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"). "An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a 'layperson would easily recognize the necessity for a doctor's attention.'" Jones v. Minn. Dep't of Corr., 512 F.3d 478, 481 (8th Cir. 2008) (quoting Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)). '[A]ctual knowledge of a serious medical need may be inferred from circumstantial evidence or from the very fact that the risk was obvious." Id. at 481–82 (citing Farmer, 511 U.S. at 842). "It is sufficient to show that the defendant-official being

sued had been exposed to information concerning the risk and thus must have known about it." Letterman v. Does, 789 F.3d 856, 862 (8th Cir. 2015) (cleaned up) (quoting Farmer, 511 U.S. at 842). If knowledge is shown, the plaintiff must then show the defendants "'knew that their conduct was inappropriate in light of' the risk to the prisoner." Id. (quoting Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009)).

"Deliberate indifference may include intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed." Pietrafeso v. Lawrence Cty., 452 F.3d 978, 983 (8th Cir. 2006) (quoting Vaughan v. Lacey, 49 F.3d 1344, 1346 (8th Cir. 1995)). However, deliberate indifference demands that a plaintiff show more than negligence and gross negligence, "and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010) (quoting Alberson v. Norris, 458 F.3d 762, 765 (8th Cir. 2006)). Rather, a plaintiff must show that the defendant's mental state was "akin to criminal recklessness." McCaster v. Clausen, 684 F.3d 740, 746 (8th Cir. 2012) (quotation omitted). When evaluating whether a defendant deliberately disregarded a risk, the court considers the "actions in light of the information [the defendant] possessed at the time, the practical limitations of [the defendant's] position and alternative courses of action that would have been apparent to an official in that position." Letterman, 789 F.3d at 862 (quoting Gregoire v. Class, 236 F.3d 413, 419 (8th Cir. 2000)). With these standards in mind, this Court addresses East's claims during the three separate time periods.

### D. August 4, 2017–August 9, 2017

East alleges that Nurse Jane Doe 1 was deliberately indifferent to his extreme pain with urination on August 5, 2017, and that Nurse Jane Doe 2 was deliberately indifferent to this same condition on August 6, 2017. Doc. 1 at ¶¶ 24–27. Nurses Jane Doe 1 and 2 argue that East failed

to exhaust these claims and that they were not deliberately indifferent in any event. Doc. 41 at 18–28.

The Prison Litigation Reform Act (PLRA) requires prisoners to exhaust all "available" administrative remedies before challenging prison conditions under § 1983. 42 U.S.C. § 1997e(a). A prisoner properly exhausts the available administrative remedies when he "complete[s] the administrative review process in accordance with the applicable procedural rules." Jones v. Bock, 549 U.S. 199, 218 (2007) (citation omitted). District courts must decide whether a prisoner exhausted his administrative remedies before addressing the merits of his claims. Benjamin v. Ward Cty., 632 F. App'x 301, 301 (8th Cir. 2016) (per curiam). The South Dakota Department of Corrections' (DOC) grievance procedure has two steps. Doc. 49 at ¶¶ 4–6. An inmate must first try to resolve his complaint informally, either by resolving the matter verbally with staff or by submitting a Request for Informal Resolution form. Doc. 49 at ¶ 5. If that doesn't work, the inmate must proceed to the second step, which requires him to file a Request for Administrative Remedy. Doc. 49 at ¶¶ 5–6.

East, though a frequent filer of grievances, did not file an inmate grievance in August or September 2017 concerning the medical care he received for his extreme urinary tract pain and alleged tubulointerstitial nephritis. Doc. 51 at ¶ 38; Doc. 60 at ¶ 38. According to East's affidavit, however, Unit Coordinator Foley refused to give East a form when he tried to file a grievance on these issues.[29] Doc. 59 at ¶ 280; Doc. 60 at ¶ 38. A prisoner need not exhaust an administrative

---

[29]Defendants argue that this Court must ignore East's allegations about Unit Coordinator Foley because they constitute an attempt to amend East's complaint or assert new theories in response to their motion for summary judgment. That is not correct. Prisoners do not need to plead exhaustion of administrative remedies in their complaints. Jones, 549 U.S. at 216. Instead, failure to exhaust is an affirmative defense that "defendants have the burden of raising and proving." Porter v. Sturm, 781 F.3d 448, 451 (8th Cir. 2015). East's allegations about Unit Coordinator Foley were an

remedy that prison officials render unavailable. Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001) (explaining that "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under" the PLRA (cleaned up and citation omitted)).   East did not have any remedy available if Unit Coordinator Foley actually refused to provide him with the required grievance form.   Kaba v. Stepp, 458 F.3d 678, 684 (7th Cir. 2006) ("[W]hen prison officials fail to provide inmates with the forms necessary to file an administrative grievance, administrative remedies are not 'available.'");   Miller, 247 F.3d at 740 (concluding that prisoner's allegation that prison refused to provide him with required grievance forms raised "an inference that he had exhausted his 'available' remedies").   This Court deems that East has either sufficiently exhausted or attempted to do so for his claim concerning the medical care he received for his extreme pain and alleged tubulointerstitial nephritis.   See Proby v. Russell, No. 4:14-cv-1620-JAR, 2016 WL 4263449, at *4 (E.D. Mo. Aug. 12, 2016).

East asserts that both Nurses Jane Doe 1 and Jane Doe 2 were deliberately indifferent to his complaints of "extreme pain" while urinating and that the Nurses' alleged failure to document his complaints shows a "reckless disregard."   Doc. 1 at ¶¶ 25, 27.   The Nurses seek summary judgment.   Even giving East's evidence all the inferences to which it is entitled under Rule 56, his claims against the Nurses do not survive summary judgment.   MDSP medical staff began treating East's extreme pain with urination and high glucose levels right when they learned of them on August 4, 2017.   East's urine test from that day showed no signs of an infection and indeed was normal other than the high levels of glucose.   PA Adams reviewed the test, concluded that East did not have a UTI, and ordered that he undergo an A1C test on Monday, August 7, to determine

---

appropriate response to the Defendants' affirmative defense rather than an attempt to amend his complaint or assert new claims.

42

whether diabetes was causing his high glucose levels. The Nurses were not deliberately indifferent to East's serious medical needs by failing to take additional action when he complained of extreme pain with urination on August 5 and 6. Again, East's urine sample from August 4 showed no signs of an infection, he was scheduled for an A1C test on August 7, and he was already taking hydrocodone, an opioid pain reliever. East's belief that the nurses should have offered additional or different treatment under these circumstances does not support an Eighth Amendment claim. See Smith v. Harris, 401 F. App'x 952, 953 (5th Cir. 2010) (per curiam) (concluding that doctors were not deliberately indifferent by failing to prescribe pain medication for an inmate's infected teeth when inmate was already prescribed pain medication for other ailments); Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995) ("[M]ere disagreement with treatment decisions does not rise to the level of a constitutional violation."). Put another way, the evidence East presented—complaints of "extreme pain," the Nurses' alleged failure to document the same,[30] and high glucose levels—would not allow a reasonable jury to conclude that the Nurses "recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." Letterman, 789 F.3d at 862 (citation omitted). Nurses Jane Doe 1 and Jane Doe 2 are entitled to summary judgment on East's claim against them.

### E. May 26, 2018 to July 30, 2018

East argues that his staph infection was a serious medical need and that Nurse Klawitter was deliberately indifferent to this need by failing to forward his complaint to a provider so that

---

[30]East cited to Rule 56(d) and asked for discovery to obtain the log nurses use when they dispense narcotics. Doc. 60 at ¶ 23. He asserts that the log is "critical" to his case because it would show his "pain level." Discovery on this issue is unnecessary because this Court has assumed for purposes of summary judgment that East did complain of extreme pain to Nurses Jane Doe 1 and 2.

he could receive antibiotics, failing to take a culture of his toe, and failing to provide him with pain relief. Doc. 57 at 43–47.

This Court assumes that East's staph infection was a serious medical need. Nurse Klawitter examined East on May 26, 2018, the very day he submitted a kite request asking to be seen for his right great toe. Viewing the evidence in the light most favorable to East, Nurse Klawitter knew that East had past trouble with his right foot and believed he had a staph infection in his right great toe after examining him. Nevertheless, Nurse Klawitter did not order a wound culture on May 26 and refused his request to forward his complaint to a provider so he could be prescribed antibiotics. She also failed to give East any pain medication even though he described his pain as "stinging" and rated it as a five out of ten. Instead, she ordered East to soak his feet four times a day with warm soapy water, to apply a small amount of bacitracin, and to return to Health Services the following day for a recheck. Nurse Klawitter's conduct at the May 27, 2018 recheck was similar. She did not give East any pain medication even though he said his pain had increased to "6–7/10,"[31] did not do a wound culture, and again declined his request to forward his complaint to a provider. Rather, she told East to continue soaking, rinsing, and applying bacitracin to his toes, that Health Services would recheck his toes in two days, and that Health Services might order a visit with a provider if East's condition had not improved by then.

This evidence is legally insufficient to allow a reasonable jury to find that Nurse Klawitter was deliberately indifferent to East's staph infection. Nurse Klawitter began treating East right away by ordering him to soak his feet, apply bacitracin to his great toes, and to return to Health Services for rechecks. This approach was too conservative for East's liking, but was not so

---

[31]East reported pain during his visits with Nurse Klawitter but does not allege that he ever asked her for pain medication.

inadequate that it amounted to deliberate indifference.  See Wallace v. Powers, No. 09-cv-224-DRH, 2009 WL 4015558, at *2, 4 (S.D. Ill. Nov. 19, 2009) (explaining that "cleaning the site of infection" and applying topical antiseptics and antibiotics is "typical" treatment for an ingrown toenail).  As a matter of law, ordering a more conservative approach during the first few days of East's infection—while also monitoring East's condition through rechecks and leaving open the possibility that he could see a provider if his condition did not approve—did not "so deviate[] from professional standards" that it violated the constitution.  Allard v. Baldwin, 779 F.3d 768, 772 (8th Cir. 2015) (explaining that where some medical care is provided, the plaintiff may "prove his case by establishing the course of treatment, or lack thereof, so deviated from professional standards that it amounted to deliberate indifference" (cleaned up and citation omitted)).

East's argument that Nurse Klawitter should have immediately taken a culture of his toe,[32] referred him to a doctor to receive antibiotics, and given him pain medication suggests that Nurse Klawitter could have provided better treatment, not that she was deliberately indifferent to his staph infection.  Put differently, East's argument amounts to a disagreement with Nurse Klawitter's medical decisions, which cannot by itself support an Eighth Amendment claim.  Estelle v. Gamble, 429 U.S. 97, 107 (1976) (explaining that a "medical decision" not to order an X-ray or "additional diagnostic techniques" does "not represent cruel and unusual punishment"); Estate of Rosenberg, 56 F.3d at 37 ("[M]ere disagreement with treatment decisions does not rise to the level of a

---

[32]East claims that it was "protocol" for Nurse Klawitter to take a culture of his toe.  Doc. 59 at ¶ 53.  His only support for this is a nurse's notation that she obtained a culture of East's toe "per protocol" during a May 17, 2019 appointment.  Doc. 59-1 at 127.  This is not enough to create a question of fact on whether MDSP had a protocol that required Nurse Klawitter to take a culture of East's toe within the first two days he visited Health Services.  And even if there was such a protocol, Nurse Klawitter's failure to follow it is not enough by itself to show deliberate indifference.  See Gayton v. McCoy, 593 F.3d 610, 622–23 (7th Cir. 2010) (holding that a nurse was not deliberately indifferent to an inmate's medical needs even though she failed to follow jail's protocol requiring her to contact a doctor when an inmate complained of chest pains).

constitutional violation."). Considering East's history with his foot, this Court understands his desire for quick, aggressive treatment of any potential infection. But the Eighth Amendment does not give East the right to immediate care in the manner he wants it at the moment he requests it. Jenkins v. Cty. of Hennepin, 557 F.3d 628, 635 (8th Cir. 2009) ("The Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish."); Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996) ("Prison officials do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment."); Sherrer v. Stephens, 50 F.3d 496, 497 (8th Cir. 1994) (per curiam) ("While the course of treatment was conservative, [the inmate's] allegations do not rise to the level of deliberate indifference.").

East did not sue the other medical professionals involved in treating his infected toe, but they too provided him with constitutionally adequate medical care. They continued to recheck East's toe, obtained cultures of his wound, provided him with antibiotics, ibuprofen, and a wheelchair, took x-rays of his foot, and referred him to Dr. Pedersen, who was able to resolve East's toe pain and infection. Even if hindsight suggests that the MDSP medical staff could have been more aggressive or should have referred East to Dr. Pedersen sooner, their conduct even in the light most favorable to East does not exceed gross negligence.

### F. January 17, 2019 to Present

#### 1. Van and Bathroom Incidents: Officers Ahrens

Defendants argue that East failed to exhaust his administrative remedies concerning Officers Ahrens's and Mastalir's conduct on January 17, 2019. East filed Informal Resolution Requests concerning the conduct of Officer Ahrens and Officer Mastalir on January 17, 2019. Doc. 41-86 at 1; Doc. 41-83; Doc. 51 at ¶¶ 98, 114; Doc. 60 at ¶ 98, 114. However, he never filed

a Request for Administrative Remedy—the second step of the DOC's grievance process—concerning either Officer Ahrens or Officer Mastalir. Doc. 51 at ¶¶ 100, 116; Doc. 60 at ¶ 100, 116. East claims that he tried to file a Request for Administrative Remedy on both officers, but that Unit Coordinator Foley refused to provide him with the necessary form. Doc. 60 at ¶¶ 100, 116; Doc. 59 at ¶¶ 136, 139. This Court deems that East has either sufficiently exhausted or attempted to do so regarding his claims concerning Officers Ahrens's and Mastalir's conduct on January 17, 2019. See Kaba, 458 F.3d at 684 ("[W]hen prison officials fail to provide inmates with the forms necessary to file an administrative grievance, administrative remedies are not 'available.'"); Proby, 2016 WL 4263449, at *4.

East argues that Officer Ahrens violated his Eighth Amendment rights when he failed to pull out the step stool in the van or otherwise assist East, leaving East to jump from the van and injure his right foot. A conditions-of-confinement claim like the one East raises has two elements. First, East must show that his conditions of confinement subjected him to a substantial risk of serious harm. Farmer, 511 U.S. at 828, 834, 837; Schoelch v. Mitchell, 625 F.3d 1041, 1046 (8th Cir. 2010). Only "'extreme deprivations,'" meaning the denial of "the minimal civilized measure of life's necessities," are sufficient to satisfy the objective component of a conditions-of-confinement claim. Hudson v. McMillian, 503 U.S. 1, 9 (1992). Second, East must show that Officer Ahrens acted with deliberate indifference to the risk posed. Farmer, 511 U.S. at 834. To be liable, Officer Ahrens must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . ." Farmer, 511 U.S. at 842.

Viewing the evidence in East's favor, Officer Ahrens failed to pull out the step stool or otherwise assist East in exiting the van even though East and the other inmates were handcuffed and belly chained and there was "ice/snow" on the ground. Two inmates jumped out of the van without assistance, but East hesitated when it was his turn. He tried but failed to reach the ground with his left foot and then jumped from the van when Officer Ahrens said, "Let's go." East almost fell on the ice and snow and felt pain in his right foot immediately. At that point, Officer Mastalir retrieved the step stool and helped the three remaining inmates out of the van. Doc. 59 at ¶ 96.

No reasonable jury could find that Officer Ahrens was deliberately indifferent on this evidence. Although having East exit the van while handcuffed and without assistance or steps is not the safest practice, it did not subject East to a substantial risk of serious harm. See McGee v. Adams, 721 F.3d 474, 479, 484–85 (7th Cir. 2013) (concluding that requiring inmate, who was wearing hand and leg restraints and a waist chain, to use a milk crate to step into a van without assistance did not provide "any basis for a claim that any of the defendants were deliberately indifferent to any substantial risk of serious harm"); Brown v. Sec'y of Pub. Safety & Corrs., No. 12-2923-P, 2013 WL 4813757, at *1–2 (W.D. La. Sept. 6, 2013) (finding that having inmate exit van without assistance and in shackles, which he claimed limited his mobility, did not create a substantial risk of serious harm); Robinson v. Lor, No. 2:09-cv-3036 KJM EFB P, 2012 WL 6005712, at *4 (E.D. Cal. Nov. 30, 2012) (finding no substantial risk of serious harm where officers had handcuffed inmate climb into back of van without steps or assistance); Lard v. Goodwin, No. 09-1083-P, 2012 WL 2879018, at *4 (W.D. La. June 21, 2012) (holding that having a legally blind inmate enter a transport van while in plasti-cuffs and shackles did not create a substantial risk of serious harm); see also LeMaire v. Maass, 12 F.3d 1444, 1457 (9th Cir. 1993) (holding that requiring dangerous inmate to wear handcuffs and leg shackles in the shower did not

create a "sufficiently unsafe condition . . . . [e]ven if the floors of the shower are slippery and [the inmate] might fall"). But even if it did, a reasonable jury could not find that Officer Ahrens was aware of this risk. After all, the first two inmates to exit the van did not fall or say they were injured and East has not offered any evidence that Officer Ahrens knew that other inmates had been injured when exiting the van without assistance or a step stool.[33] Moreover, East was not wearing any leg irons, did not say he couldn't jump from the van, and did not ask for assistance. Officer Ahrens cannot be held liable for failing to infer a substantial risk of harm under these circumstances. Cf. Reynolds v. Dormire, 636 F.3d 976, 980–81 (8th Cir. 2011) (finding that allegations supported an inference of deliberate indifference where inmate alleged that officers parked a transport van three feet from a five-foot deep sally port pit, that the officers did not assist him as he backed out of the van even though he was wearing leg irons and handcuffs, that another prisoner had fallen into the pit earlier that day, and that corrections staff knew of this prior incident).

East alleges that MDSP knew his history with his right foot, that Medical should have told Officer Ahrens about his foot "based on policy," and that Officer Ahrens should have known that East was going to the hospital to get a custom orthotic for his foot. Doc. 59 at ¶ 98. If Officer Ahrens knew that East was getting a custom orthotic for his right foot, his failure to assist East in exiting the van is more troublesome. But mere knowledge of East's need for a custom orthotic would not support a jury finding that Officer Ahrens was aware that failing to assist East when he

---

[33]East claims that another inmate told him that on January 15, 2019, he was "forced to jump out of the van (on a med trip) without any assistance, his knees buckled and he believes the officer to be Defendant Ahrens." Doc. 59 at ¶ 130. He claims that the inmate's left knee was "entirely purple/red." Doc. 59 at ¶ 130. This hearsay account does not create a question of fact on whether Officer Ahrens knew that not having the step stool out on January 17, 2019, exposed East and other inmates to a substantial risk of serious harm.

exited the van posed a substantial risk of serious harm. That is, Officer Ahrens could not have inferred that East's right foot was so delicate that jumping down from a van would likely cause East to suffer (at least according to him) a toe injury and "protruding hardware that later required surgery." Doc. 57 at 109. See Graham v. Harley, No. 1:10-cv-00265-SKO PC, 2010 WL 4717665, at *3 (E.D. Cal. Nov. 12, 2010) (finding no facts to suggest that a prison guard was aware of an excessive risk that a shackled inmate with limited mobility in his leg and hip and difficulty walking because of a stroke would seriously hurt himself while exiting van); see also Spruce v. Sargent, 149 F.3d 783, 786 (8th Cir. 1998) ("An official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, is not deliberate indifference to an inmate's health or safety . . . ." (cleaned up and citation omitted)).

East notes that Defendants admitted that DOC "policy, procedure, and/or custom" dictates that corrections officers are to assist inmates in and out of transportation vehicles to prevent injury. This Court agrees with East that Officer Ahrens should have followed this policy. His failure to do so, however, is not, on this record, enough to show deliberate indifference. Henderson v. Brown, No. 08 C 3172, 2010 WL 3861056, at *5 (N.D. Ill. Sept. 27, 2010) (concluding that guard's failure to follow prison protocol of assisting shackled inmates as they exited a van was "not equivalent to subjecting [the inmate] to a substantial risk of serious harm").

East also claims that Officer Ahrens was deliberately indifferent to a substantial risk of serious harm when he refused to help East pull his pants up. He claims that he resorted to "jumping up and down" to get his pants up and that this caused further injury and pain in his right foot. No reasonable jury could find in East's favor on either element of this deliberate indifference claim. Officer Ahrens is entitled to summary judgment on the deliberate indifference claims concerning East's foot.

East's last claim against Officer Ahrens involves the bathroom incident. East asserts that Officer Ahrens violated his Eighth Amendment rights by refusing to uncuff one of his hands so he could wipe after defecating. He alleges Officer Ahrens's refusal resulted in him having to "sit in my own fecal matter for over 3 hours." "[T]he Eighth Amendment prohibits punishments that deprive inmates of the minimal civilized measure of life's necessities." Howard v. Adkison, 887 F.2d 134, 137 (8th Cir. 1989) (citation omitted). "[I]nmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time." Howard, 887 F.2d at 137.

Thus, prison guards violated the Eighth Amendment when they forced an inmate to defecate in his pants and sit in his excrement for two days while chained in a hospital bed. Brooks v. Warden, 800 F.3d 1295, 1303–04 (11th Cir. 2015). Similarly, an inmate stated an Eighth Amendment claim by alleging that he was denied for three days—during which he had diarrhea—showers, toiletries, and cleaning supplies as well as the ability to wash his hands after defecating into a bucket. Williams v. Artus, No. 13-CV-00680A(F), 2016 WL 3919726, at *5 (W.D.N.Y. May 31, 2016), report and recommendation adopted, No. 13-CV-680A, 2016 WL 3882912 (W.D.N.Y. July 18, 2016). An inmate was also found to state an Eighth Amendment claim where he defecated in his pants and a guard made him sit in his own waste for five hours, saying "You're gonna have to sit in it and suffer, you ugly fuckface." Mitchell v. Newryder, 245 F. Supp. 2d 200, 203–05 (D. Maine 2003).

Other circuit courts have rejected Eighth Amendment claims of inmates subject to indignities far beyond what East claims to have endured. In Cunningham v. Eyman, 17 F. App'x 449 (7th Cir. 2001), the Seventh Circuit concluded that guards did not violate the Eighth Amendment when an inmate urinated and defecated in his pants after they refused to remove his

51

shackles, the guards made derogatory comments and used racial slurs, and the inmate remained in soiled clothes for four to five hours. Id. at 454. Likewise, the Sixth Circuit found no Eighth Amendment violation when prison guards forced an inmate to urinate himself and did not allow him to change for three hours. LaPine v. Savoie, No. 16-1893, 2017 WL 6764085, at *5 (6th Cir. Aug. 11, 2017). Cunningham and LaPine likely represent the extreme cases bordering on Eighth Amendment violations, but East's allegations are nowhere close to that border. An inmate does not have an Eighth Amendment claim merely due to unsanitary conditions of short duration. The Eighth Circuit in Whitnack v. Douglas County, 16 F.3d 954 (8th Cir. 1994), for instance, found no constitutional violation where inmates were kept in a dirty cell—it had dried feces on both the inside and outside of the toilet, hair and vomit on the sink, rotting food and garbage on the floor, and dried mucus covering the walls—for three to four hours before they were given limited cleaning supplies. Id. at 958; see also Stickley v. Bird, 703 F.3d 421, 423–24 (8th Cir. 2013) (holding that detention center's policy of only providing one role of toilet paper a week to each detainee did not violate a pretrial defendant's constitutional rights even though the detainee ran out of toilet paper every week for a six-month period and was forced to wait up to 30 minutes to clean himself in the shower after a bowel movement).

East not being allowed to wipe for three to four hours after defecating in a toilet is a temporary hardship not serious enough to violate the Eighth Amendment. He defecated in the toilet rather than his pants and was able to clean himself a relatively short time later. See Smith v. Copeland, 87 F.3d 265, 269 (8th Cir. 1996) (explaining that the length of time a prisoner is subjected to harsh conditions is a "critical factor" in determining whether conditions of confinement violate the Eighth Amendment). Although Officer Ahrens's refusal to uncuff East so

he could wipe may have been callous and unnecessary, it did not amount to a constitutional violation.

### 2.   Handcuffing: Officer Mastalir

East claims that Officer Mastalir violated the Eighth Amendment by using excessive force when handcuffing him. The "core judicial inquiry" in East's Eighth Amendment excessive force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 6–7. Prison guards act maliciously "by undertaking, without just cause or reason, a course of action intended to injure another;" they act sadistically "by engaging in extreme or excessive cruelty or by delighting in cruelty." Howard v. Barnett, 21 F.3d 868, 872 (8th Cir. 1994).

Officer Mastalir is entitled to summary judgment on East's excessive force claim. East's own affidavit states that it is standard procedure for inmates returning from a medical trip to be strip searched and handcuffed and to remain handcuffed until guards escort them through the "second fence." Doc. 59 at ¶ 112. Consistent with this procedure, Officer Mastalir handcuffed East and the other inmates in the van and strip searched them. Doc. 59 at ¶¶ 108–112. East complained once that the handcuffs hurt and offered to go without a coat if that would make the cuffs less tight. Officer Mastalir refused to loosen them, saying they were "just going through the fence." Doc. 59 at ¶ 108. East remained handcuffed for approximately ten to fifteen minutes while two other inmates were handcuffed and strip searched. Doc. 59 at ¶¶ 110–111. The handcuffs were removed once East was inside MDSP. Doc. 59 at ¶ 112. Even taking this evidence in the light most favorable to East, a reasonable jury could not find that Officer Mastalir acted maliciously and sadistically for the purpose of causing East harm. It was standard procedure to handcuff and strip search inmates returning from medical appointments, and Officer Mastalir's

refusal to loosen the cuffs after East complained once of pain does not show the necessary intent. See Guerrero v. Rivera, No. EDCV 13-0092-JGB (JPR), 2013 WL 878285, at *2 (C.D. Cal. Mar. 8, 2013) (holding that inmate could not state an Eighth Amendment excessive force claim against prison guards who refused a single request from him to loosen his handcuffs because they were too tight); Cunningham v. Culliver, No. 10-00114-CG-M, 2011 WL 6092431, at *11 (S.D. Ala. Nov. 14, 2011) (holding that an inmate, who had a history of creating disturbances and engaging in frequent altercations with officers, failed to show that guard acted maliciously and sadistically by handcuffing him too tightly when escorting him back from the shower and refusing his repeated requests to loosen the handcuffs); Smith v. Yarborough, No. CV 04-4502-DSF(JTL), 2008 WL 4877464, at *12–14 (C.D. Cal. Nov. 7, 2008) (concluding that prison guard's failure to loosen handcuffs after inmate's single complaint that they were too tight did not show that the guard acted maliciously and sadistically where inmate was handcuffed as part of a weapons search of all cells shortly after a guard had been assaulted by another inmate); Clark v. Neff, No. 06-4012, CV-C-SOW, 2007 WL 2463011, at *2–4 (W.D. Mo. Aug. 27, 2007) (finding no evidence that prison guards acted maliciously or sadistically when they handcuffed inmate for an hour to transport him to a dental appointment and ignored his repeated complaints that the handcuffs were too tight and were causing his hands to go numb).

Officer Mastalir nevertheless would be entitled to qualified immunity even if East had shown that a reasonable jury could find that he engaged in excessive force. Qualified immunity protects Officer Mastalir from East's § 1983 claim so long as he didn't violate East's "clearly established" constitutional rights. Reichel v. Howards, 566 U.S. 658, 664 (2012). A right is "clearly established" if the law was sufficiently clear that every reasonable guard would understand that his conduct violated that right. District of Columbia v. Wesby, 138 S. Ct. 577, 589–90 (2018).

Although a plaintiff need not cite a "case directly on point" to show that a right is clearly established, "controlling authority" or "a robust consensus of cases of persuasive authority" must put the "constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741–42 (2011) (citation and internal marks omitted). "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." Wesby, 138 S. Ct. at 589 (cleaned up) (citation omitted). Courts deciding whether a constitutional right is clearly established must avoid defining the right at "a high level of generality." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (per curiam) (citation and internal marks omitted). Instead, the "dispositive question is whether the violative nature of *particular* conduct is clearly established." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam) (citation and internal marks omitted).

East has not cited any cases that would have made it clear to Officer Mastalir that handcuffing him and ignoring his single complaint about the handcuffs causing pain violated the Eighth Amendment. And cases from other circuits show that any such right is not clearly established. In Matthews v. Copeland, No. 18-5070, 2019 WL 3286176 (6th Cir. May 29, 2019), for instance, the Sixth Circuit held that prison guards did not violate an inmate's clearly established Eighth Amendment rights by placing "excessively tight" leg shackles on him and refusing his single request to loosen the shackles, even though the inmate remained shackled for over five hours and suffered cuts and bleeding. Id. at *2–3. Similarly, the Tenth Circuit in Stevenson v. Cordova, 733 F. App'x 939 (10th Cir. 2018), held that an official was not on notice that his refusal to loosen an inmate's handcuffs, despite the inmate's repeated requests, violated the Eighth Amendment. Id. at 945–46.

### 3. Hands and Wrists: Nurse Huber

East argues that Nurse Huber failed to provide him with constitutionally adequate health care on January 18, 2019, when he complained of pain and tingling in his hands from being handcuffed too tightly the day before. Nurse Huber's examination of East showed a quarter-sized bruise on the inside of his left wrist. His capillary refill was more than three seconds, but he had strong and equal grasps and could feel sharp and soft objects. Viewing the evidence in the light most favorable to East, Nurse Huber told him to monitor his hands and wrists and return to Health Services in one to two weeks if things did not improve. Doc. 59 at ¶ 120. It is undisputed, however, that Nurse Huber placed an order for "provider to review chart concerning possible soft hand cuffs," that she spoke with Dr. Wallinga about East, and that Dr. Wallinga ordered that soft cuffs be used because of East's Raynaud's disease. Doc. 51 at ¶ 120; Doc. 60 at ¶ 120; 52-1 at 84–87.

Even if the pain and tingling in East's hands and wrists was a serious medical need, no reasonable jury could find that Nurse Huber violated the Eighth Amendment. January 18 was the first time East complained to Health Services about his hands and wrists, and neither his complaint nor the results of Nurse Huber's examination were particularly alarming. Nevertheless, Nurse Huber got Dr. Wallinga to issue an order for soft cuffs so that East would not suffer pain when handcuffed in the future. Her decision not to do anything further under these circumstances falls well short of deliberate indifference.

### 4. Hands and Wrists: PA Zimmer

East claims that the treatment PA Zimmer provided for his hands and wrists was constitutionally inadequate. Even viewing the evidence in the light most favorable to East, the care PA Zimmer provided for East's hands and wrists does not meet the deliberate indifference standard. She initially prescribed East Etodolac and gave him range of motion exercises for his

hands and wrists. When East reported more serious symptoms in mid-May 2019—loss of feeling in both arms and urinary and bowel incontinence—PA Zimmer responded appropriately. She ordered x-rays of East's spine, stomach, and kidneys, blood and urine tests, and an MRI. About a month later, PA Zimmer ordered that East be seen by a neurologist. PA Zimmer is entitled to summary judgment on East's claim concerning his hands and wrists.

### 5.   Hardware Protrusion and Toe Injury: PA Zimmer

East claims that PA Zimmer was deliberately indifferent to the bony prominence and numbness in his right foot. Again, the record does not bear this out. On January 17, 2019, the very day East claims to have injured his foot jumping out of the prison transport van, PA Zimmer ordered x-rays of East's foot, that he use a wheelchair and walking boot for two weeks, and that he return for a recheck a few days later. The x-rays were sent to Dr. Pedersen, who confirmed that the hardware was still intact and that everything was stable. PA Zimmer ordered Etodolac for the swelling in East's foot when she saw him February 8. East complained of worsening problems with his foot in a May 17, 2019 kite-request slip, and PA Zimmer saw him on May 23, 2019. Although she suspected that the skin changes and bony prominence in East's foot was chronic, she ordered x-rays of East's foot and a follow up with podiatry given East's "persisting complaints." PA Zimmer responded to East's complaints in a timely and appropriate manner. Her failure to be even more attentive did not violate the Eighth Amendment.

East's complaint alleged that PA Zimmer exhibited "deliberate disregard" for the staph and strep infection in his right toenail, but he did not address this claim in his brief opposing Defendants' motion for summary judgment. In any event, the record does not support this claim. PA Zimmer prescribed Keflex when the culture of his toe came back positive for staph and strep.

When East saw Dr. Pedersen on June 10, 2019, he said the antibiotics "took care of the ingrown toenail," and Dr. Pedersen did not see any cellulitis. Doc. 59-2 at 3.

### 6.   Rectal Exam: PA Zimmer

PA Zimmer is entitled to summary judgment on East's claim regarding the rectal exam. Paragraphs 124 through 126 of East's complaint concern the rectal exam. East alleged that he was "uncomfortable" about having a female perform the exam and that he asked PA Zimmer whether it was legal for a female to examine a male prisoner's rectum. Doc. 1 at ¶ 124. She replied that it was legal if he consented and that she would not examine his rectum if he was uncomfortable but that he would have to sign a refusal form. Doc. 1 at ¶ 124. East alleged that he asked whether a male could perform the exam and that PA Zimmer replied that he had two options: "[O]ne you let me stick my finger up your butt and sign a consent form, so I can't be held liable, or you sign a refusal form stating you are refusing medical treatment." Doc. 1 at ¶ 124. East then said he would sign the consent form because he didn't "want to refuse any medical treatment." Doc. 1 at ¶ 124. East alleged that there was "no reasonable justification for Zimmer and MDSP to deny" his request that a male provider perform the exam and handle his future appointments. Doc. 1 at ¶ 125. He also asserted that MDSP "established a custom that a PA of the opposite sex can force an inmate to decide between having an uncomfortable rectal exam or refusing medical treatment, when a same sex provider worked at the facility." Doc. 1 at ¶ 126. East never alleged that he did not want a rectal exam at all, that PA Zimmer performed the exam in an inappropriate manner, or that the exam caused him pain. Rather, the thrust of paragraphs 124 through 126 is that PA Zimmer and

MDSP wrongfully refused his request to have a male provider perform his rectal exam and conduct his future appointments.[34]

Defendants argued that summary judgment on East's claim was appropriate because East did not have a clearly established right to be free from medical exams conducted by members of the opposite sex. Doc. 41 at 63–67. East did not respond to this argument in his brief opposing Defendants' motion for summary judgment. Doc. 57 at 125–28. Rather, he argued that he had an Eighth Amendment claim for sexual abuse against PA Zimmer. A prison official's sexual assault or harassment of an inmate can, under certain circumstances, "constitute the unnecessary and wanton infliction of pain forbidden by the Eighth Amendment." Freitas v. Ault, 109 F.3d 1335, 1338 (8th Cir. 1997) (cleaned up and internal citation omitted). A plaintiff bringing an Eighth Amendment claim for sexual abuse must "prove, as an objective matter, that the alleged abuse or harassment caused 'pain' and, as a subjective matter, that the officer in question acted with a sufficiently culpable state of mind." Id. In response to the motion for summary judgment, East submitted an affidavit claiming, for the first time, that PA Zimmer did not use any lubrication when she examined his rectum. Doc. 59 at ¶ 167. And he claimed in his brief, again for the first time, that PA Zimmer "painfully inserted her finger into" his anus and that he experienced "fear, anxiety, worry, and extreme physical pain."[35] Doc. 57 at 127.

---

[34]Indeed, East's complaint states "this case is limited to the medical care or lack thereof he received, from August 4, 2017 to August 9, 2017, for extreme pain and Tubulointerstitial nephritis, May 26, 2018 to July 30, 2018, for staph/strep infection, and January 17, 2019 to present, for foot, back, hand/wrist injuries, including sexual abuse." Doc. 1 at ¶ 18. In an earlier order, this Court wrote that the sexual abuse alleged by East "appears to stem from" the incident where East used the bathroom at the hospital and Officer Ahrens refused to uncuff him or assist in pulling his pants up. Doc. 39 at 2.

[35]East's grievance about the rectal exam did not claim that the exam caused him pain or that PA Zimmer did not use lubrication. Doc. 59-1 at 95. Indeed, the grievance did not say anything about the way PA Zimmer performed the exam. PA Zimmer filed an affidavit stating that she did, in

This Court will not consider East's Eighth Amendment claim for sexual abuse because he did not plead it in his complaint. <u>See</u> <u>Wendt v. Iowa</u>, 971 F.3d 816, 820–21 (8th Cir. 2020) (holding that district court properly refused to consider a claim not pleaded in complaint but raised for the first time in response to a motion for summary judgment); <u>N. States Power Co. v. Fed. Transit Admin.</u>, 358 F.3d 1050, 1057 (8th Cir. 2004) (explaining that parties may not "manufacture claims, which where were not pled, late into the litigation for the purpose of avoiding summary judgment"). True, the Federal Rules of Civil Procedure only require plaintiffs to "give the defendant fair notice of what the claim is and the grounds upon which it rests." <u>WireCo WorldGroup, Inc. v. Liberty Mut. Fire Ins. Co.</u>, 897 F.3d 987, 992 (8th Cir. 2018) (cleaned up and citation omitted). But East's complaint fails even this permissive standard. That is, his allegations about the rectal exam did not provide fair notice that his Eighth Amendment claim against PA Zimmer was based on the way she performed the exam. <u>See</u> <u>id.</u> at 993 (explaining that where the plaintiff was specific as to the grounds of the defendant's alleged breach of contract, the defendant "was not required to intuit additional theories of [contractual] liability that were not apparent from [the plaintiff's] complaint").

The structure of East's complaint undercuts any argument that he was trying to plead an Eighth Amendment sexual abuse claim against PA Zimmer. As noted above, East asserted three counts in his complaint: Count 1 alleged that PA Zimmer and others violated his Eighth Amendment rights by being deliberately indifferent to his serious medical needs, Doc. 1 at ¶¶ 102, 109, 117, 154–58; Count 2 alleged that Officers Ahrens, Barta, and Mastalir violated his Eighth Amendment rights by, among other things, the "unnecessary and wanton infliction of pain," using

---

fact, use gloves and lubrication when examining East's rectum and that East never complained about the exam being painful. Doc. 79 at ¶¶ 5–6, 8–9.

unnecessary force, and failing to protect him from a substantial risk of serious harm, Doc. 1 at ¶¶ 159–162; and Count 3 alleged that Wardens Fluke and Dooley established a policy or custom of deliberate indifference, Doc. 1 at ¶¶ 163–66. Although Counts 1 and 2 are both based on the Eighth Amendment, they are distinct claims that require different sorts of proof. Thomas v. Bryant, 614 F.3d 1288, 1303–04 (11th Cir. 2010) (explaining that a claim for deliberate indifference to serious medical needs is "distinct" from a conditions-of-confinement claim and an excessive force claim); McClanahan v. Young, 4:13-CV-04140-RAL, 2016 WL 520983, at *6 (D.S.D. Feb. 5, 2016) (explaining that the proof necessary to show an Eighth Amendment violation "depends on the type of claim alleged"). East's failure to include PA Zimmer in Count 2 reveals that the only Eighth Amendment claim he was bringing against her was for deliberate indifference to his serious medical needs.

East waived his claim that PA Zimmer should have allowed a male provider to perform the exam by failing to respond to the Defendants' argument on this claim. Satcher v. Univ. of Ark. at Pine Bluffs Bd. of Trs., 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."). East has no viable claim against PA Zimmer related to the rectal exam, and she is entitled to summary judgment on that claim.

### 7. Blood Draw: Nurses Bastemeyer and Klawitter

Nurses Bastemeyer and Klawitter are entitled to summary judgment on East's claim that the blood draw violated his Eighth Amendment rights. The Nurses were drawing East's blood per PA Zimmer's orders, and they stopped and told him to hydrate after their initial attempts failed. It is unfortunate that the Nurses could not find East's vein immediately. However, a reasonable jury could not find that their conduct violated the Eighth Amendment. Ali v. McAnany, 262 F. App'x 443, 446 (3d Cir. 2008) (per curiam) (finding that allegations that the nurse made two attempts to

draw prisoner's blood after another nurse had made two previous attempts did not "give rise to a reasonable inference that [the nurse] inflicted the two puncture wounds for the purpose of causing [the plaintiff] harm"); Bustillo v. Pfannkuchen, No: 2:15-cv-640-FtM-29MRM, 2016 WL 1572392, at *2 (M.D. Fla. Apr. 19, 2016) (holding that allegations of failed blood draw attempts made per a doctor's request did not show that the attempts were done for malicious or sadistic purposes); Guinn v. McEldowney, No. 2:14-CV-13085, 2014 WL 4489588, at *3 (E.D. Mich. Sept. 10, 2014) (collecting cases and explaining that while "being stuck with a needle during multiple blood draw attempts can be painful, such conduct is not the type of unnecessary and wanton infliction of pain that constitutes cruel and unusual punishment"); Johnson v. Ill. Dep't of Corrs., No. Civ. 04-222-MJR, 2006 WL 741318, at *6 (S.D. Ill. Mar. 22, 2006) (concluding that allegations that a defendant caused the plaintiff "unbearable pain" trying to take his blood by sticking him with a needle "nowhere near veins" did not state a claim under the Eighth Amendment); Boreland v. Vaughn, No. CIV. A. 92-0172, 1993 WL 62707, at *6 (E.D. Pa. Mar. 3, 1993) ("The use of a needle to draw blood is hardly the cruel and unusual punishment contemplated by the Eighth Amendment.").

**8. Officer Barta: Work Incident**

East claims that Officer Barta violated his Eighth Amendment rights by ordering him to perform duties as a disinfectant runner more often. "Claims that a prisoner's assigned work exceeded his physical capacity are covered under the Eighth Amendment, and require a showing that an official was deliberately indifferent to a known serious medical need." Mays v. Rhodes, 255 F.3d 644, 649 (8th Cir. 2001). For this sort of claim, East must show that Officer Barta knowingly compelled him to perform physical labor that was beyond his strength, dangerous to his health, or unduly painful. Id.

Taking the evidence in the light most favorable to East, East told Officer Barta that he only performed his duties as a disinfectant runner once a day because he had "prominent hardware in [his] foot" and Foley, the previous unit coordinator, did not want East to suffer "further" injury; that it was East's "understanding" that new Unit Coordinator Tycz "was under the same impression as Foley;" and that East was going to have surgery on his foot.  This evidence is not enough to withstand Officer Barta's motion for summary judgment.  First, it is undisputed that East did not have any work restrictions when Officer Barta told him he needed to do his job more often.[36]  Doc. 41-57 at 1; Doc. 41-85; Doc. 51 at ¶ 176; Doc. 60 at ¶ 176.  Second, East does not allege that he told Officer Barta that a medical provider—as opposed to a unit coordinator—said he should limit his activity.[37]  See Doc. 59 at ¶ 185; Doc. 1 at ¶ 143.  Third, East does not allege that he showed Officer Barta his foot or otherwise exhibited symptoms that would have made Officer Barta aware that having East act as a disinfectant runner more that once a day posed a substantial risk of serious

---

[36]East alleged in his complaint that Officer Barta undermined "medical orders" for East to limit his activity by ordering him to perform his job more often. Doc. 1 at ¶ 146. East does not dispute, however, that his medical records showed that he did not have a work restriction when Officer Barta told him to perform his job more often. Doc. 51 at ¶ 176; Doc. 60 at ¶ 176.

[37]One of the paragraphs in East's lengthy affidavit quotes from the kite-request slip he submitted on June 24, 2019. Doc. 59 at ¶ 187. This paragraph states in part: "'June 22, 2019 Corporal Barta informed me I needed to do my job more often. This increased my activity. On February 8, 2019 PA Karissa Zimmer told me to limit my activity to prevent further complications, former Unit Coordinator Brian Foley also did not want me further injuring my foot. I'm under the impression new Unit Coordinator Tycz is under the same impression. I tried to explain this to Barta but he didn't care and told me I had to do it more often.'" Doc. 59 at ¶ 187. This paragraph does not create a question of fact concerning whether East told Officer Barta that PA Zimmer said he should limit his activity. First, the paragraphs in East's affidavit and complaint describing what he told Officer Barta do not allege that he told Officer Barta that PA Zimmer said he should limit his activity. Doc. 59 at ¶ 185; Doc. 1 at ¶ 143. Second, the medical record from East's February 8, 2019 appointment does not say that PA Zimmer told East to "limit his activity." Instead, PA Zimmer wrote that East had no tenderness in his right foot and that the January 2019 x-ray of the foot showed no acute issues and was stable compared to the prior x-ray. Doc. 52-1 at 97–99. Third, East does not dispute that his medical records showed that he did not have a work restriction when Officer Barta told him to perform his job more often. Doc. 51 at ¶ 176; Doc. 60 at ¶ 176.

harm. Fourth, East informed Barta that he performed his job once a day and claims that Barta saw him doing his job on at least one occasion. Doc. 59 at ¶ 185. In short, East's statements do not allow for the reasonable inference that Officer Barta—never having been told that Health Services placed limits on East's activities or imposed a work restriction and apparently never having seen anything to suggest that East had a serious foot condition—knew that ordering East to perform his job—which he was already doing once a day—more often posed a substantial risk of serious harm. See Moore v. Moore, 111 F. App'x 436, 438 (8th Cir. 2004) (per curiam) (explaining that "in the absence of a medical lay-in or any other medical confirmation to support [the inmate's] assertions that he was too injured to work, there is no evidence to show that [prison] officials were aware that working [in a particular job] posed a risk to [the inmate's] health or safety"); Reeves v. Collins, 27 F.3d 174, 176–77 (5th Cir. 1994) (per curiam) (concluding that prison guards were not deliberately indifferent by forcing an inmate who did not have any medical restrictions to perform cleaning duties despite the inmate's complaint of a back injury and his later diagnosis of having a double hernia; other than the inmate's complaint of pain, there was no indication that he had a hernia).

This is not to say, of course, that a prison guard can simply ignore and refuse to follow up on an inmate's claim that he has a work restriction. In Sanchez v. Taggart, 144 F.3d 1154 (8th Cir. 1998), for example, the Eighth Circuit found sufficient evidence to allow a claim to survive summary judgment where the prison guard failed to inquire further after the inmate said he had a medical condition restricting his ability to work and that his file would confirm these limitations. Id. at 1156. Nor can a prison guard avoid liability simply because an inmate does not have a medical restriction order. The Sixth Circuit in Smith v. Yarrow, 78 F. App'x 529 (6th Cir. 2003), rejected a prison guard's argument that she was unaware of an inmate's hernia condition until she

received a medical restriction discussing it.  Id. at 535–36.  Instead, the Sixth Circuit found a question of fact based on testimony that the guard's supervisor had informed her of the inmate's hernia condition, that the inmate's hernia had once become so visibly swollen that the guard thought the inmate was concealing something, and that the inmate had told the guard about his condition on multiple occasions and shown her is bottom-bed order.  Id.  But East's case is not like Yarrow or Sanchez; he does not claim that he told Officer Barta that there were work restrictions in his file (there weren't) and the evidence he offered to show Officer Barta's knowledge is far weaker than the evidence in Yarrow.  Officer Barta is entitled to summary judgment on East's claim against him.

### 9.   Wardens Fluke and Dooley: Policy or Custom

Count 3 of East's complaint alleges that all the constitutional violations he suffered are attributable to policies or customs established or condoned by Wardens Fluke and Dooley acting in their official capacities.  Since East has not shown an unconstitutional act by an MDSP employee, MDSP cannot be liable for having an unconstitutional policy or custom.  Webb v. City of Maplewood, 889 F.3d 483, 487 (8th Cir. 2018).  In any event, East cannot recover damages from MDSP or the Wardens in their official capacities.  Will, 491 U.S. at 71.  East also appears to be suing the Wardens in their individual capacities for failing to ensure that he received constitutionally adequate medical care and condoning the conduct of Officer Ahrens and Mastalir.  These claims fail because the care East received did not fall below Eighth Amendment standards and Officers Ahrens and Mastalir did not violate East's rights.  Morris v. Cradduck, 954 F.3d 1055, 1060 (8th Cir. 2020).  Wardens Dooley and Fluke are entitled to summary judgment.

## V.   Conclusion

For the reasons stated above, it is hereby

65

ORDERED that Defendants' Motion for Summary Judgment, Doc. 40, is granted.  It is further

ORDERED that East's Ex Parte Motion for Sanctions and Appointment of Counsel, Doc. 92, Ex Parte Motion for Appointment of Counsel, Doc. 93, Ex Parte Motion for Sanctions and Appointment of Counsel, Doc. 94, Ex Parte Motion for Appointment of Counsel, Doc. 95, and Motion for Miscellaneous Relief, Doc. 97, are denied.  It is further

ORDERED that Defendants' Motion to Disregard Plaintiff's Objection, Doc. 85, is denied.


DATED this 30ᵗʰ day of September, 2020.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

66